## Case No. 24-8058

---

In the United States Court of Appeals
for the Tenth Circuit

---

**United States of America**,
Plaintiff-Appellee,

v.

**Steven Shobert,**
Defendant-Appellant.

---

On Appeal from the United States District Court
for the District of Wyoming (Cheyenne)
The Honorable Scott W Skavdahl, District Judge
D.C. Case No. 23-cr-00153-SWS

---

## Appellant's Opening Brief

---

Office of the Federal Public
Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192
Email: Jon_Grevillius@fd.org

Virginia L. Grady
Federal Public Defender

Jon W. Grevillius
Assistant Federal Public Defender

Attorneys for Appellant

Oral argument is requested.

February 26, 2025

# Table of Contents

Table of Authorities....................................................................iv

Prior or Related Appeals ..........................................................1

Jurisdiction...............................................................................1

Issue Presented .......................................................................1

Statement of the Case .............................................................2

    1.  Following his arrest, Mr. Shobert is taken to the emergency room and hospitalized following a seizure. ................................2

    2.  Shortly after he was medicated, law enforcement seeks consent to search Mr. Shobert's home. ................................4

    3.  Mr. Shobert is prosecuted for possessing firearms found during law enforcement's search of his house. ........................6

    4.  Mr. Shobert conditionally pleads guilty to possession of a machine gun........................................................9

Argument Summary...................................................................9

Argument...............................................................................10

    1.  The district court clearly erred in concluding that Mr. Shobert voluntarily consented to the search of his home......................10

        A.  Standard of Review ............................................10

        B.  Discussion .........................................................11

    2.  18 U.S.C. § 922(o) is unconstitutional......................................21

        A.  This claim is reviewed de novo. ..........................21

        B.  Background ........................................................22

        C.  Discussion .........................................................23

Conclusion.............................................................................28

Oral Argument Statement .......................................................28

Certificate of Compliance .......................................................30

# Attachment

1. Judgment in a Criminal Case.

# Table of Authorities

## Cases

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)..........................11

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ......................26

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)...............................25, 27

*Chavez v. City of Arvada*, 88 F.3d 861 (10th Cir. 1996) ........................11

*District of Columbia v. Heller*, 554 U.S. 570, (2008) .................24, 25, 27

*Ferguson v. City of Charleston*, 308 F.3d 380 (4th Cir. 2002) ...............16

*Garrity v. New Jersey*, 385 U.S. 493 (1967) ...........................................16

*Maloney v. Singas*, 351 F. Supp. 3d 222 (E.D.N.Y. 2018) ......................26

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)..22, 23, 24, 25, 27

*Plaza Speedway Inc. v. United States*, 311 F.3d 126 (10th Cir. 2002)..11, 14

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................. 12, 14, 19, 21

*United States v. Brown*, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025) ..25, 28

*United States v. Brune*, 767 F.3d 1009 (10th Cir. 2014) ........................22

*United States v. Haney*, 264 F.3d 1161 (10th Cir. 2001) ........................27

*United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011).. 11, 12, 13, 14

*United States v. McCurdy*, 40 F.3d 1111 (10th Cir. 1994) .....................12

*United States v. Molt*, 589 F.2d 1247 (3d Cir. 1978) ..............................13

*United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024)..25, 26

*United States v. Rahimi*, 602 U.S. 680 (2024) ........................................24

*United States v. Shields*, 573 F.2d 18 (10th Cir. 1978) ..........................12

*United States v. United States Dist. Ct.*, 407 U.S. 297 (1972)...............11

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) .........11

*United States v. Venjohn*, 104 F.4th 179 (10th Cir. 2024).......................27

## Statutes

18 U.S.C. § 3231 .............................................................................................1

18 U.S.C. § 922(g)(8).....................................................................................24

18 U.S.C. § 922(o) .............................................. 7, 10, 21, 22, 25, 27

26 U.S.C. §§ 5845(a) ......................................................................................7

26 U.S.C. §§ 5861(d) ......................................................................................7

28 U.S.C. § 1291 .............................................................................................1

## Constitutional Provisions

U.S. Const. amend. II................................................... 7, 22, 23, 24, 25, 27

U.S. Const. amend. IV.............................................................................11

## Prior or Related Appeals

None.

## Jurisdiction

The district court had jurisdiction over Mr. Shobert's case under 18 U.S.C. § 3231. The court entered judgment on August 28, 2024. Vol. I, 66-71.[1] Mr. Shobert timely filed his Notice of Appeal the next day. *Id.*, 72-73. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented

Did the district court clearly err in finding Mr. Shobert's consent for law enforcement to search his home and seize firearms voluntary when: (1) he was under the influence of sedatives in an emergency room following a seizure while in police custody; (2) officers falsely represented that surrendering firearms was a prerequisite for a medical furlough; and (3) officers characterized their purpose for entering his home as concern for his continued medical treatment?

---

[1] Record citations are stated as "Vol. [volume number], [page number]."
Page citations are by .pdf pagination.

1

## Statement of the Case

**1. Following his arrest, Mr. Shobert is taken to the emergency room and hospitalized following a seizure.**

Mr. Shobert visited an off-duty police officer's house in his neighborhood in Worland, Wyoming one afternoon because he wanted to share with that officer details about a missing persons case. Vol. IV, 133. Worland is a small town, and Mr. Shobert knows and is friendly with members of local law enforcement. *Id*. But the officer called police to have Mr. Shobert removed because he was very drunk and had a pistol in a holster on his hip. *Id*.

Sheriff's deputies and town officers arrived, and, after determining that Mr. Shobert drove to the house, arrested him without incident on suspicion of driving under the influence. *Id*. Mr. Shobert was still heavily intoxicated by the time he was booked into the jail. *Id*. The county court set bond conditions the next morning, but Mr. Shobert did not post a bond and so remained in custody. *Id*., 133-34.

Later that morning, Mr. Shobert was found unresponsive on the floor of his cell, having experienced "violent shaking" and a fall following a seizure. Vol. II, 5; Vol. IV, 134. He was rushed to the

emergency room, where he continued to suffer effects of alcohol withdrawal syndrome. Vol. IV, 81, 85, 134.

Colleen McClain, a local sheriff's deputy, accompanied Mr. Shobert at the hospital because he remained in county custody. Deputy McClain confirmed Mr. Shobert was "not really coherent" and "seemed out of it." *Id.*, 28. Mr. Shobert did not know why he was there and remembered nothing after going to the off-duty officer's house the afternoon before. *Id*. Thus, while medical records showed Mr. Shobert may have been "alert" and "answering questions appropriately" when admitted, in medical terms, this indicated only that he was conscious and could answer basic questions about whether he was in pain. *Id.*, 28, 87-88.

Upon admission to the emergency room, doctors gave Mr. Shobert Lorazepam, which they repeated 15 minutes later. *Id.*, 86. Lorazepam is used to treat seizures and alcohol withdrawal. According to Mr. Shobert's emergency room doctor, it "induces a sedation-type effect on the brain and almost produces symptoms of drunkenness." *Id.*, 85. The patient will be confused, drowsy, and potentially disoriented. *Id.*, 86. If given intravenously, as it was for Mr. Shobert, the medication's effect

3

will "peak" within 20 minutes and "gradually wear off over the next three and half hours." *Id.*, 87.

Further, according to the doctor, someone in this state should not be making important life decisions. *Id.*, 90. This applied to Mr. Shobert specifically:

> [F]or the two hours that Mr. Shobert was in the emergency department, I don't think he should be making any important decisions because he had, you know, not only a seizure, but he had two doses of lorazepam on top of that.

*Id.*, 90.

## 2. Shortly after he was medicated, law enforcement seeks consent to search Mr. Shobert's home.

Law enforcement was notified that Mr. Shobert would need to be admitted to the hospital following his stay in the emergency room because of the risk of another seizure amid alcohol withdrawal. *Id.*, 32. Sergent Oberth, who helped take Mr. Shobert into custody the day before, then spoke with the county attorney to arrange a medical furlough from custody because the sheriff's department did not have the staffing to assign a deputy to always stay with Mr. Shobert. *Id.*

Sergeant Oberth then travelled to the hospital to and ask Mr. Shobert whether he would allow law enforcement to gather firearms

from his house. He questioned Mr. Shobert about an hour and 45 minutes after admission to the emergency room and approximately an hour and 20 minutes after Mr. Shobert received his second injection of Lorazepam. *Id.*, 26, 32-33, 54, 86.[2]

Deputy McClane, who remained with Mr. Shobert, was present for this conversation. Vol. IV, 32-33. She heard the sergeant tell Mr. Shobert that, per Mr. Shobert's "court conditions" and the county attorney, law enforcement needed to retain his firearms so they "can do a medical furlough so that you [Mr. Shobert] can get the treatment you need." *Id.*, 33.[3]

However, furlough and bond conditions did not require Mr. Shobert to relinquish his firearms. The furlough order imposed only *one condition* on Mr. Shobert: that he return to the county jail upon leaving the hospital. Vol. II, 35-37. And Mr. Shobert was not on bond, so bond

---

[2] Mr. Shobert arrived at the hospital close to 11:02 a.m. and was given an injection of Lorazepam three minutes later and then a second injection 15 minutes after that. *Id.*, 26, 86. Sergeant Oberth asked for consent to search at approximately 12:45. *Id.*, 54.
[3] Unlike Mr. Shobert's arrest the previous day, this encounter was neither recorded on body-worn camera nor thoroughly documented in police reports. Vol. II, 6.

conditions did not apply. Further, placement on the medical furlough did not affect whether Mr. Shobert would continue to receive needed treatment at the hospital. He would continue to receive needed treatment as determined by the hospital regardless. Vol. IV, 43. Sergeant Oberth did not tell him this when seeking his consent.

Mr. Shobert responded by asking if he could go to his house along with the officers, noting he wanted to take care of something and that he had weapons in various places in the house. *Id.*, 34-35. The sergeant replied that his only concern was that Mr. Shobert "get the medical treatment he needs" and that the department could not afford to have someone sit with him during his entire hospital stay. *Id.*, 67, 75.

Mr. Shobert then relented and consented to the search. Vol. IV, 35. He told Sergeant Oberth that law enforcement could retrieve firearms from his house, adding that he "*needed medical care.*" *Id*. (emphasis added).

## 3. Mr. Shobert is prosecuted for possessing firearms found during law enforcement's search of his house.

Law enforcement relied on Mr. Shobert's alleged consent to perform a warrantless search of his home for firearms. Vol. II, 7. As relevant here, they found a Glock pistol converted to a fully automatic

firearm and a short-barreled rifle. *Id.*, 7. Thereafter, the federal government indicted Mr. Shobert on one count of possessing a machine gun, 18 U.S.C. § 922(o), and one count of possessing a short-barreled rifle, 26 U.S.C. §§ 5861(d) & 5845(a). Vol. I, 11-12.

Mr. Shobert filed two pretrial motions relevant here. First, he moved to suppress evidence gained through law enforcement's search of his home. Second, he moved to dismiss the indictment, arguing that 18 U.S.C. § 922(o) violates the Second Amendment. *Id.*, 15-25. The district court denied each motion.

In his motion to suppress the evidence, he asserted the government could not show that his purported consent for law enforcement's search of his home was voluntary. Vol. II, 4-19. Specifically, he argued that his consent was involuntary for three reasons: (1) Sergeant Oberth falsely told him that relinquishment of firearms was a requirement of his medical furlough; (2) the sergeant suggested that his treatment could be affected by refusal to consent; and (3) his condition rendered him vulnerable and unable to understand he had a meaningful choice to refuse consent while still receiving treatment. *Id.*; Vol. IV, 107-114.

Mr. Shobert presented expert testimony from his treating physician in the emergency room, Dr. Lauer, who affirmed that Mr. Shobert was not "totally competent" while he was in the ER and could not make "complex decisions." Vol. IV, 97. Dr. Lauer explained that Mr. Shobert recently had a seizure, which left him disoriented, and he was given a high dosage of Lorazepam, which is "quite sedating." *Id*. The Lorazepam's effects last from four to six hours, and the medication "peaks" in 20 minutes after it is administered. *Id*., 87. Further, he testified that someone in this condition following a seizure might otherwise appear alert and respond appropriately to some questions yet remain confused. *Id*., 83.

The district court denied the motion, ruling that Mr. Shobert gave law enforcement voluntary consent to search his home. While it credited Dr. Lauer's testimony, it found that his testimony did not contradict Sergeant Oberth or Deputy McClain's testimony that Mr. Shobert seemed alert and able to converse after being in the emergency room for two hours. *Id*., 133.

The court believed that Mr. Shobert's condition improved within the two hours he was in the emergency room and that he was "alert and

processing information" when the sergeant was asking for his consent to search. *Id.*, 137. According to the court, Mr. Shobert's statements showed that he heard and understood Sergeant Oberth's statements. *Id.* Also, the court opined that Sergeant Oberth did not implicitly suggest to Mr. Shobert that his medical care would be affected by his consent or lack thereof. *Id.*, 138, 141. However, the court declined to make findings on what the sergeant said specifically. *Id.*, 138.

## 4. Mr. Shobert conditionally pleads guilty to possession of a machine gun.

Mr. Shobert entered a conditional guilty plea to Count 1, possession of a machine gun, under 18 U.S.C. § 922(o), preserving his right to challenge the denial of his motions to suppress and dismiss. *Id.*, 152, 165-67. The district court sentenced him to 18 months' imprisonment, a significant departure from his Guidelines range of 37 to 46 months. *Id.*

This appeal follows.

## Argument Summary

The district court committed two reversible errors.

First, it clearly erred by concluding that the government proved Mr. Shobert gave law enforcement voluntary consent to search his home

while he was medicated and in the emergency room following a seizure. The district court's ruling failed to account for Sergeant Oberth's false statements that Mr. Shobert had to relinquish his firearms to be placed on furlough. Additionally, the court's conclusion that Sergeant Oberth did not suggest that Mr. Shobert's continued treatment would be affected if he were not placed on the furlough is implausible. It was clear the sergeant told Mr. Shobert he was concerned about continued treatment when explaining why he sought consent.

Second, the district court erroneously denied his motion to dismiss Count 1. 18 U.S.C. § 922(o) is unconstitutional on its face and as-applied to Mr. Shobert. The government did not (and cannot) meet its burden to show that the statute's ban on machine guns is constitutional.

## Argument

### 1. The district court clearly erred in concluding that Mr. Shobert voluntarily consented to the search of his home.

#### A. Standard of Review

Mr. Shobert preserved this issue. Vol. II, 4-109; Vol. IV, 107-114. Therefore, this Court reviews for clear error the district court's ruling

he provided voluntary consent for the search. *See United States v. Harrison*, 639 F.3d 1273, 1277 (10th Cir. 2011).

A district court commits clear error where, as here, it fails to consider all relevant facts. *See Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1271 (10th Cir. 2002). Further, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *Chavez v. City of Arvada*, 88 F.3d 861, 865 (10th Cir. 1996) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)), or when the finding is implausible "in light of the record viewed in its entirety . . . ." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

**B. Discussion**

Warrantless home searches, like the search of Mr. Shobert's house, presumptively violate the Fourth Amendment. *Harrison*, 639 F.3d at 1278; *see* U.S. Const. amend. IV. Law enforcement's "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). Evidence gathered from an

11

unconstitutional home search is inadmissible. *Harrison*, 639 F.3d at
1278.

While consent is an exception to the warrant requirement, the
government bears the burden of showing that a defendant's consent was
valid. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Specifically,
the government "must show that there was no duress or coercion,
express or implied, that the consent was unequivocal and specific, and
that it was freely and intelligently given." *United States v. McCurdy*, 40
F.3d 1111, 1119 (10th Cir. 1994).

To determine whether consent was voluntary, courts must
examine the totality of circumstances, with particular attention to both
subtle forms of law enforcement coercion and the "possibly vulnerable
subjective state of the person who consents." *Bustamonte*, 412 U.S. at
229. Multiple factors can vitiate consent, including: physical or mental
impairment; promises or inducements from law enforcement;
misrepresentations, whether intentional or innocent; failure to inform
of the right to refuse; the presence of multiple officers; and custodial
status. *See Harrison*, 639 F.3d at 1278; *McCurdy*, 40 F.3d at 1119;
*United States v. Shields*, 573 F.2d 18, 23 (10th Cir. 1978).

Here, the district court clearly erred in concluding  that Mr.

Shobert voluntarily consented to law enforcement's search of his home

for two key reasons. First, contrary to the district court's finding,

Sergeant Oberth obtained consent through inducement and

misrepresentation, which made it involuntary. Second, the court erred

in concluding that Sergeant Oberth did not imply that continued

medical treatment was tied to receiving the medical furlough.

### *(i)      Sergeant Oberth obtained Mr. Shobert's consent by falsely telling him it was required as a condition of his medical furlough.*

Mr. Shobert provided consent to search his home because

Sergeant Oberth incorrectly told him that the search was required for

the furlough. These false statements rendered his consent involuntary.

*See, e.g., Harrison*, 639 F.3d at 1278; *United States v. Molt*, 589 F.2d

1247, 1251-52 (3d Cir. 1978). ("When evidence exists to show . . . that a

defendant believed he must consent such evidence weighs heavily

against a finding that consent was voluntarily given. And when that

belief stems directly from misrepresentations by government agents,

however innocently made, we deem the consent even more

questionable.").

The district court committed clear error because it did not consider the fact that Sergeant Oberth *falsely* told Mr. Shobert that a condition of the furlough was that he agree to the search or relinquish his firearms. While the court clarified that relinquishment was a condition of bond, it correctly found he was not on bond. Vol. III, 134. Therefore, he was not subject to bond conditions, and the medical furlough order did not require Mr. Shobert to relinquish his firearms.

As law enforcement's inducement to elicit consent is a paramount factor in the voluntariness analysis, *e.g., Harrison*, 639 F.3d at 1280, the district court's failure to address this inducement was clearly erroneous. *See Plaza Speedway Inc.*, 311 F.3d at 1270-71 (concluding that the district court committed clear error by failing to consider significant facts in evidence).

The sergeant's misrepresentation proved decisive in overcoming Mr. Shobert's initial refusal to consent. At the time, Mr. Shobert was susceptible to coercion even if he was recovering and could understand Sergeant Oberth's request because he was in a vulnerable state during his entire emergency room stay. Vol. IV, 90; *see Bustamonte*, 412 U.S. at 229 (requiring courts to consider a person's "possibly vulnerable

14

subjective state" when evaluating consent). Despite Mr. Shobert's express reluctance to allow officers to enter his home without his presence, Sergeant Oberth pressed Mr. Shobert while in a vulnerable condition, falsely explaining that the furlough required it. The sergeant never showed Mr. Shobert the furlough order, nor did anyone inform him that his release onto the furlough was not contingent on surrendering his firearms—because no such condition existed.

### (ii)    *Sergeant Oberth induced consent by implicitly tying Mr. Shobert's consent to search to him continuing to receive needed treatment.*

Next, the district court's determination it was "clear" that "[t]here was never any threats or any *indications*" that Mr. Shobert would not continue to receive treatment unless he consented to the search is implausible on the record below. Vol. IV, 138 (emphasis added).

The district court found that Sergeant Oberth's reference to the medical furlough when seeking Mr. Shobert's consent was motivated by a good faith concern over the sheriff's resources and ability to keep Mr. Shobert in custody while he was being treated. *Id.* Further, instead of making any finding on what Sergeant Oberth and Mr. Shobert said, the court accepted the sergeant's *opinion* that his statements did not imply

or suggest that Mr. Shobert's treatment would be affected by his refusal to consent. Vol. IV, 73, 138.

What the district court inferred from the evidence—that Sergeant Oberth did not even imply continued medical treatment was connected to the furlough and firearm relinquishment—was implausible based on the record as a whole. The record conclusively demonstrates that the request to search was intertwined with discussions of Mr. Shobert's medical treatment, which was coercive. *E.g., Ferguson v. City of Charleston*, 308 F.3d 380, 403 (4th Cir. 2002) ("The choice to be searched or forego necessary medical treatment 'is the antithesis of free choice' to consent or refuse.") (quoting *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967)). Every piece of evidence addressing what Sergeant Oberth said shows that he mentioned Mr. Shobert's continued need of treatment when explaining *why he needed Mr. Shobert's consent to search*.

To start, Sergeant Oberth's own report explicitly connected the search to medical treatment, stating he asked for permission to enter Mr. Shobert's home "to retrieve the items *so he could be released from*

16

*the Sheriff's Office custody and focus on medical treatment*." Vol. II, 6
(emphasis added).[4]

Deputy McClain corroborated this connection when she testified
that Sergeant Oberth told Mr. Shobert that allowing the search would
enable "a medical furlough ***so that*** *you can get the medical treatment*
*that you need*." Vol. IV, 32-33 (emphasis added). Notably, Deputy
McClain also testified that when Mr. Shobert consented to the search,
he immediately referenced that "He needed medical care." *Id.*, 35.

Sergeant Oberth's own testimony repeatedly emphasized that he
made this connection between the furlough and continued care in his
request for consent. When Mr. Shobert requested to accompany officers
during the search, the sergeant testified he responded that his "only
concern was that he get[s] medical treatment that he needs." *Id.*, 67.
And when Mr. Shobert expressed concerns about other items in his
house, the sergeant again redirected to medical treatment, telling the
court he informed Mr. Shobert that "I wasn't concerned about the stuff,
like, in his house. I was concerned about him getting medical

---

[4] Although the report is not in the record on appeal, this quotation
appears in Mr. Shobert's Motion to Suppress. The government did not
dispute it accurately quoted from the sergeant's report.

treatment." *Id.*, 75. Most tellingly, Sergeant Oberth testified that Mr.

Shobert's consent came only "*after* I explained to him that *we needed to*

*get him his medical treatment* and we can't afford to have somebody sit

on him the entire time." *Id.*, 75 (emphasis added).

While the sergeant avoided explicitly conditioning medical

treatment on firearms relinquishment, his presentation left Mr. Shobert

with only one reasonable conclusion—that his access to necessary

medical care depended on consenting to the search. The sergeant

juxtaposed Mr. Shobert's urgent medical needs with the demand for

consent yet never clarified that these were entirely separate issues. He

failed to explain that the medical furlough was independent of the

firearms request, that Mr. Shobert's treatment was not contingent on

consent, and that refusal would not result in his immediate return to

jail. This omission proved especially coercive given Mr. Shobert's

circumstances: he was confined to an emergency room bed, under the

influence of post-seizure sedation, and lacking any accurate explanation

of the medical furlough process. Deputy McClain's testimony confirms

the coercive effect—Mr. Shobert consented precisely because he "needed

medical care." *Id.*, 35.

18

The district court's order does not explain how else the sergeant's statements could reasonably be interpreted except in the way Mr. Shobert interpreted them: that he needed the furlough to continue receiving needed treatment at the hospital. Any reasonable person hearing the terms "*medical* furlough" and "*medical* treatment" when an officer is explaining why law enforcement is seeking consent would conclude consent and treatment are intertwined—unless they were, unlike Mr. Shobert, explicitly told otherwise. Add to that, the sergeant immediately went to the hospital to seek consent *while Mr. Shobert was still in the emergency room*. This timing could only suggest an exigency that did not exist, particularly where, as here, Sergeant Oberth attempted to minimize Mr. Shobert's concerns by assuring him that law enforcement was "not concerned" about his weapons, only his medical treatment. Vol. IV, 67.

### (iii)     *The district court's clear errors fatally undermine its conclusion that Mr. Shobert's consent was voluntary.*

The district court's other findings cannot compensate for its clear error in concluding that Mr. Shobert was not coerced or induced into giving consent. *See Bustamonte*, 412 U.S. at 234 ("Where there is

coercion there cannot be consent."). After initial apprehension, he agreed to let law enforcement enter his home without a warrant because he incorrectly believed he had to relinquish his firearms to law enforcement to be placed on a medical furlough. In turn, he also believed, due to what Sergeant's Oberth's statements suggested, he needed to consent to continue to receive needed treatment.

That Mr. Shobert's emergency room bed was open to medical staff and that he was not restrained by handcuffs, Vol. IV, 140, does not affect whether he was induced to consent by being told, falsely, that his consent was required for a medical furlough. Nor can the emergency room's otherwise open and seemingly hospitable setup dispel the implication that the furlough was necessary for his continued treatment.

Further, Mr. Shobert was denied the request to accompany law enforcement and *was* confined to a hospital bed he could not leave. Despite the district court's conclusion that Mr. Shobert was "coherent, tracking the conversations and processing the information" when Sergeant Oberth sought his consent, he remained medicated on a sedative and required hospitalization following a dangerous seizure. His

condition was a factor even if, on its own, it did not render his consent involuntary. *See id*. at 229 (The "possibly vulnerable subjective state of the person who consents" is a factor the court must consider.).

Therefore, the district court committed clear error when it denied Mr. Shobert's motion to suppress and concluded the government met its burden. It failed to address the key fact that he consented to the search under the false information that he had to in order to be released from custody onto a furlough, and it implausibly concluded law enforcement did not even suggest to him, confined in the emergency room and sedated as he was, that continued treatment would be affected without the furlough.

This Court should reverse.

## 2.  18 U.S.C. § 922(o) is unconstitutional.

### A. This claim is reviewed de novo.

Mr. Shobert preserved this issue, moving to dismiss Count 1 on the basis that § 922(o) is unconstitutional on its face and as applied. Vol. I, 15-26. The district court denied his motion. Vol. IV, 124-28.

This Court reviews *de novo* whether the district court erred by denying his motion to dismiss Count 1. *See United States v. Brune*, 767 F.3d 1009, 1015 (10th Cir. 2014).

### B. Background

Mr. Shobert moved to dismiss Count 1 of the indictment, arguing that 18 U.S.C. § 922(o) is unconstitutional on its face and as applied to him. Vol. I, 15-26. Specifically, he argued that the statute is unconstitutional under the historical tradition test the Supreme Court established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), because the Second Amendment's plain text covers machine gun possession, and machine guns are in common use for self-defense. Additionally, he raised an as-applied challenge. Vol. I, 25.

The government opposed Mr. Shobert's motion, contending that Supreme Court precedent forecloses the argument that the Second Amendment's text applies to possession of machine guns, that machine guns are not in common use, and that § 922(o) is consistent with this county's historical tradition of firearm regulation. Vol. I, 51-58. However, the government did not contest Mr. Shobert's assertion that

there are at least 740,000 lawfully possessed and registered machine guns in this country. *Id.*, 56.

The district court denied Mr. Shobert's motion. It reasoned that the Second Amendment does not apply to machine gun possession and that, in any event, they are not in common use. Vol. IV, 126-27. According to the court, 740,000 machine guns corresponds to roughly .25 percent of the country's population, which entails they are not in "common use." *Id.*, 127-28. The court also denied his as-applied challenge. *Id.*, 128.

## C. Discussion

In *Bruen*, the Supreme Court established a two-part "text-and-history standard" for determining whether a regulation violates the Second Amendment. *See Bruen*, 597 U.S. at 39. Specifically, *Bruen* explained that (1) conduct covered by the plain text of the Second Amendment is presumptively protected by the amendment and cannot be restricted, *id.* at 24, unless (2) the government can demonstrate a historical tradition of "distinctly similar" regulations (in the case of "general societal problem[s] that [have] persisted since the 18th century"), *id.* at 26, or "relevantly similar" analogues (in the case of

"unprecedented societal concerns or dramatic technological changes"), *id.* at 27.

Following *Bruen*, the Supreme Court upheld 18 U.S.C. § 922(g)(8) against a facial and as applied challenge in *United States v. Rahimi*, 602 U.S. 680 (2024). There, the Court reasoned that the statute's prohibition on those with restraining orders from possession firearms is "relevantly similar" to the nation's tradition of surety and going armed laws. *See id.* at 698-99.

Section 922(o) is unconstitutional facially and as applied under this framework.

First, the Second Amendment applies to firearms and devices here. *Heller* confirmed that the right the Second Amendment protects is an individual right that includes "us[ing] arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The word "arms" in the Second Amendment includes both "armour of defence" and "weapons of offence." *Heller*, 554 U.S. at 581. Since the founding of this country, "arms" has included "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively

protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *see also Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms).

While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including machineguns. *Bruen*, 142 S. Ct. at 2132. Thus, the plain language of the Second Amendment covers machineguns under the first step of the *Bruen* test (plain text), meaning that § 922(o) is presumptively unconstitutional, and the government cannot meet its burden to show that the statute is constitutional.

The government cannot meet its burden to show that § 922(o) is constitutional by demonstrating there are "relevantly similar" historical analogues to § 922(o). That is because none exist. Congress did not ban machine gun possession until 1986, and machine guns have existed for over a century. *See United States v. Brown*, __ F. Supp. 3d __, 2025 WL 429985 at *1 (S.D. Miss. Jan. 29, 2025); *United States v. Morgan*, __ F. Supp. 3d __, 2024 WL 3936767 at * 4 (D. Kan. Aug. 26, 2024).

25

Machine gun possession is common for self-defense, so § 922(o) cannot be upheld as falling under a tradition of banning "dangerous *and* unusual" weapons. *See Bruen*, 142 S. Ct. at 2143. As of April 2020, there were over 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives. Vol. I, 23-24. As of May 2021, that number had increased to over 740,000 machineguns lawfully possessed and registered in the United States. *Id*.; *Morgan*, at *4. These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress regulated their possession in the mid-1930's but has continued to grow.

The number of lawfully possessed machineguns far surpasses that of other weapons (e.g., tasers and nunchaku) that courts have declared are "in common use." *See, e.g., Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the

United States sufficient to show the weapon was "in common use"); *see also Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (concluding that stun guns are widely possessed and that a categorical ban on their possession violates the Second Amendment).

Therefore, § 922(o) is facially unconstitutional. This Court's contrary holding in *United States v. Haney*, 264 F.3d 1161, 1164-65 (10th Cir. 2001), does not control here because intervening Supreme Court decisions have undermined the holding's basis. *See, e.g., United States v. Venjohn*, 104 F.4th 179, 183 (10th Cir. 2024) (holding that circuit precedent is no longer binding if the Supreme Court abrogates it). In *Haney*, this Court upheld a constitutional challenge to § 922(o), concluding first that the Second Amendment conferred no individual right and second that firearm regulations are subject to means-end scrutiny. *See Haney*, 264 F.3d at 1164-65. Both conclusions are false: *Heller* definitively and directly rejected the former proposition, and *Bruen* the latter. *See Heller*, 554 U.S. at 576, 582, 592-95; *Bruen*, 142 S. Ct. at 2126-29.

Additionally, the government cannot demonstrate a distinctly similar historical tradition regarding the particular circumstances of

27

Mr. Shobert's case. His weapons were found inside his home, and there is no indication he did anything more than possess the weapons in his home—he threatened no one nor disrupted the public peace. *See Brown*, at *3. Indeed, American history and tradition strongly support weapons possession inside the home. *Id*.

Therefore, the district court erroneously denied Mr. Shobert's Motion to Dismiss Count 1.

## Conclusion

The district court erroneously denied Mr. Shobert's motion to suppress evidence and motion to dismiss Count 1. This Court should therefore reverse.

## Oral Argument Statement

Counsel requests oral argument because he believes it will assist this Court in deciding the issues in this case.

Respectfully submitted,

Virginia L. Grady
Federal Public Defender


By:  */s/ Jon W. Grevillius*
Jon W. Grevillius
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
(303) 294-7002
Email: Jon_Grevillius@fd.org

## Certificate of Compliance

As required by Fed. R. App. P. 32(g)(1), I certify that this brief is proportionally spaced and contains 5,208 words. I relied on my word processor to obtain the count, and the information is true and correct to the best of my knowledge.

/s/ Jon W. Grevillius
Jon W. Grevillius
Assistant Federal Public Defender