# Tenth Circuit No. 24-8058

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff/Appellee, | |
| v. | |
| **STEVEN SHOBERT,** | |
| Defendant/Appellant. | |

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

**The Honorable Scott W. Skavdahl
Chief United States District Court Judge**

**District Court No. 23-CR-153-SWS**

# BRIEF OF APPELLEE

STEPHANIE I. SPRECHER
ACTING UNITED STATES ATTORNEY
District of Wyoming

CHRISTYNE M. MARTENS
ASSISTANT UNITED STATES ATTORNEY
P.O. Box 22211
Casper, Wyoming 82602
PLAINTIFF-APPELLEE

**May 28, 2025**

**ORAL ARGUMENT IS NOT REQUESTED**

**THERE ARE NO ATTACHMENTS**

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS............................................................................. i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED APPEALS ..............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................1

STATEMENT OF CASE ........................................................................3

I. Factual Background. ..........................................................................3

II. Relevant Procedureal History…………………………………………….. 6

    A.  Proceedings related to Shobert's motion to suppress ...................6
    B.  Proceedings related to Shobert's motion to dismiss Count 1  .....13
    C.  Shobert conditionally pled guilty and we sentenced ..................16

ARGUMENT ........................................................................................16
I.     Shobert voluntarily consented to the search of his home for firearms and ammunition…………………………………………………….    16
    A.  Standard of Review ...................................................................17
    B.  The totality of the circumstances show that Shobert's consent was voluntarily given ............................................................................17
        1. Shobert's medical care was not conditioned on his consent or a medical furlough……………………………………………………    18
        2. Sergeant Oberth did not mislead Shobert……………………    21

  II.    Prohibitions on machine guns are constitutional. .......................25
    A.  Standard of Review ...................................................................25
    B.  Statutory Background.................................................................26
    C.  Section 922(o) is a constitutional restriction on the mode or manner of fire ....................................................................................27
    D.  The Second Amendment does not protect firearms that are not typically possessed by law-abiding citizens for lawful purposes .............29
    E.  Machineguns are not in common use for lawful purposes .........32

F.  Secton 922(o) is consistent with the historical principle that the
    government may ban dangerous and unusal weapons ................................38

CONCLUSION ........................................................................................47

STATEMENT REGARDING ORAL ARGUMENT ...........................................48

CERTIFICATE OF COMPLIANCE...................................................................489

CERTIFICATE OF SERVICE ............................................................................50

Page(s)

**CASES:**

*Baca v. Department of the Army*,
    983 F.3d 1131 (10th Cir. 2020) ........................................................ 26

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) .......................................................... 26

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .......................... 2, 3, 27, 28, 29, 30, 31, 32, 37, 38, 39, 40

*DeWilde v. Attorney General*,
    No. 32-8054 (10th Cir.)(2016 ATF letter) .................................... 1, 36

*Friedman v. City of Highland Park*,
    136 S. Ct. 447 (2015) ...................................................................... 33

*Hamblen v. United States*,
    591 F.3d 471 (6th Cir. 2009) ............................................................ 33

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ............................................... 33, 36, 38

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ....................... 2, 13, 15, 25, 27, 29, 30, 31, 39, 40, 41, 45, 46

*Rocky Mountain Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024) ................................................... 32, 34

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973) .................................................................. 17, 18

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ........................................................ 25

*United States v. Fincher*,
    538 F.3d 868 (8th Cir. 2008) ..................................................... 32, 38

*United States v. Gutierrez-Hermosillo*
142 F. 3d 1225, 1231(10th Cir. 1998) .................................................. 17

*United States v. Harrison*,
   639 F.3d 1273 (10th Cir. 2011) ........................................................... 17, 23, 24


*United States v. Henry*,
   688 F.3d 637 (9th Cir. 2012) ..................................................... 33, 38


*United States v. Jones*,
   701 F.3d 1300 (10th Cir. 2012) ......................................................... 18

*United States v. Kenney*,
   91 F.3d 884 (7th Cir. 1996) ............................................................. 44

*United States v. Kimoana*,
   383 F.3d 1215 (10th Cir. 2004) ......................................................... 17

*United States v. Latorre*,
   893 F.3d 744 (10th Cir. 2018) ..................................................... 17, 18

*United States v. Martinez*,
   92 F.4th 1213 (10th Cir. 2024) ......................................................... 26

*United States v. Miller*,
   307 U.S. 174, 179 (1939) .......................................................... 30, 31

*United States v. O'Brien*,
   560 U.S. 218 (2010) ..................................................................... 33

*United States v. One Palmetto State Armory PA-15 Machinegun Receiver/Frame*,
   822 F.3d 136 (3rd Cir. 2016).................................................. 32-33, 38

*United States v. Price*,
   111 F.4th 392 (4th Cir. 2024) (en banc) ............................................ 32

*United States v. Quezada-Lara*,
   831 F. App'x 371 (10th Cir. 2020) .................................................... 18

*United States v. Rahimi*,
   602 U.S. 680 (2024) .................................... 2, 27, 32, 38, 39, 45, 46, 47

*United States v. Woody*,
   45 F.4th 1166 (10th Cir. 2022) ......................................................... 23

*United States v. Zaleski,*
   489 F. App'x 474 (2d Cir. 2012) ....................................................... 33

*United States v. Zapata,*
   997 F.2d 751 (10th Cir. 1993) ......................................................... 25

**Statutes, Rules and Constitutional provisions**

U.S. Const. amend. II ................................................................................. 27

18 U.S.C. § 921 ........................................................................................ 26

18 U.S.C. § 922 . 1, 2, 3, 6, 13, 14, 15, 16, 26, 27, 28, 29, 32, 33, 38, 44, 45, 46, 47

26 U.S.C. § 5811 ...................................................................................... 45

26 U.S.C. § 5845 .............................................................................. 26, 28

26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845(a)-(b) .......... 44

26 U.S.C. §§ 5861(d) & 5845(a) ............................................................... 6

Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ....... 44

18 Pa. Cons. Stat. § 908 ........................................................................... 35

720 Ill. Comp. Stat. 5/24-1 ...................................................................... 34

Alaska Stat. § 11.61.200 ........................................................................... 34

Ariz. Rev. Stat. Ann. § 13-3101 ............................................................... 34

Ariz. Rev. Stat. Ann. § 13-3102 ............................................................... 34

Ark. Code Ann. § 5-73-204 ...................................................................... 34

Ark. Code Ann. § 5-73-205 ...................................................................... 34

Cal. Penal Code § 32625............................................................................ 34

Colo. Rev. Stat. § 18-12-102 .................................................................... 34

Conn. Gen. Stat. § 53-202 ........................................................................ 34

D.C. Code Ann. § 22-4514 ....................................................................... 34

Del. Code Ann. tit. 11, § 1444 ................................................................. 34

Fla. Stat. § 790.221 .................................................................................. 34

Ga. Code Ann. § 16-11-122 .............................................................. 34-35

Ga. Code Ann. § 16-11-124 .............................................................. 34-35

Haw. Rev. Stat. § 134-8 ........................................................................... 34

Ind. Code § 35-47-5-8 .............................................................................. 35

Ind. Code § 35-47-5-10 ........................................................ 35

Iowa Code § 724.1 .............................................................. 34

Iowa Code § 724.3 .............................................................. 34

Kan. Stat. Ann. § 21-6301 .................................................... 35

La. Stat. Ann. § 40:1752 ...................................................... 35

Mass. Gen. Laws ch. 140, § 131 ........................................... 34

Md. Code Ann., Criminal Law § 4-403 ................................. 35

Md. Code Ann., Criminal Law § 4-404 ................................. 35

Md. Code Ann., Criminal Law § 4-405 ................................. 35

Me. Stat. tit. 17-A, § 1051 ................................................... 35

Me. Stat. tit. 17-A, § 1052 ................................................... 35

Mich. Comp. Laws § 750.224 .............................................. 35

Minn. Stat. § 609.67, subd. 2 ............................................... 34

Mo. Rev. Stat. § 571.020 ..................................................... 35

N.C. Gen. Stat. § 14-409 ..................................................... 35

N.D. Cent. Code § 62.1-05-01 ..............................................35

N.J. Stat. Ann. § 2C:39-5 .................................................... 34

N.Y. Penal Law § 265.02 ..................................................... 34

Neb. Rev. Stat. § 28-1203 .................................................... 35

Nev. Rev. Stat. § 202.350 .................................................... 35

Ohio Rev. Code Ann. § 2923.11 ........................................... 35

Ohio Rev. Code Ann. § 2923.17 ........................................... 35

Or. Rev. Stat. § 166.272 ...................................................... 35

R.I. Gen. Laws § 11-47-8 ..................................................... 34

S.C. Code Ann. § 16-23-230 ................................................ 35

S.C. Code Ann. § 16-23-250 ................................................ 35

S.C. Code Ann. § 23-31-330 ................................................ 35

S.D. Codified Laws § 22-1-2 ................................................. 35

S.D. Codified Laws § 22-14-6 .............................................. 35

Tenn. Code Ann. § 39-17-1302 ............................................ 35

Tex. Penal Code Ann. § 46.05 .............................................. 35

Va. Code Ann. § 18.2-290 ................................................... 35

Va. Code Ann. § 18.2-291 ................................................... 35

Va. Code Ann. § 18.2-295 ................................................... 35

W. Va. Code § 61-7-9 ........................................................ 35

Wash. Rev. Code § 9.41.190 ................................................ 35

Wis. Stat. § 941.26 ........................................................... 34

**Other Authorities**

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) ....... 39

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ........................ 39

4 William Blackstone, *Commentaries on the Laws of England*
(10th ed. 1787) ................................................. 39

ATF, Current Processing Times ........................................... 37

Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one
of the 630,000 in the U.S.* (Dec. 21, 2018) .......................................... 36

H.R. Rep. No. 83-1337 (1954) ….......................................... 34

H.R. Rep. No. 99-495 (1986) .............................................. 34

John Berrigan, et al., *The Number and Type of Private Firearms in the United
States*, Annals of the American Academy of Political and Social Science, Vol. 704,
Issue 1 (Nov. 2022) ................................................. 36

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. ................................................. 44

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273 (2022) .................... 37

Pew Research Center, Key facts about Americans and guns ................................37

Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ........................................... 46

Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57 (2023) ......................................... 43,46

S. Rep. No. 73-1444 (1934) ................................................. 44

Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers (June 2018) ................................................. 36

The Trace, *How Many Guns are Circulating in the U.S.?* ................................... 36

U.S. Census Bureau, Happy New Year 2024! ........................................37

W. Kip Viscusi & Kyle J. Blasinsky, *Leveraging Public Support for Gun Laws to Reduce Mass Shootings*,
2024 U. Ill. L. Rev. 707, 755 (2024) ............................................... 44

William Baude & Robert Leider, *The General-Law Right to Bear Arms*,
99 Notre Dame L. Rev. 1467, 1489 (2024) ..................................... 28


**Historical Statutes**
2 Edw. 3, c. 3 (1328) (Eng.) ................................................. 39

Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869) ......................................... 40

Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904) ................................................. 40

Act of Dec. 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346 ..................................... 42

Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794) ............................................................................................................. 40

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436 ................................................. 41

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 ....................................................... 41

Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200 ............................. 41

Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76.............................................. 41

Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148 ........................ 41

Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404 ....................................... 42

Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26 ............................................ 42

Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137 ................................................. 42

Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148 .................................... 41

Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129 ........................................ 41

Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56 ..................................................... 41

Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115 ......................................... 41

Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95................. 42

Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35 .......................................... 42

Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51.................................... 42

Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25 ............................ 41-42

Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17 ........................................... 42

Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724…................. 42

Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709 .............................. 42

Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57 ................................................ 42

Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136 ...............................42

Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175 ...................................... 42

Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231 ...................................... 42

Act of May 24, 1879, § 1, 1879 Ill. Laws 114 ...................................................... 42

Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48................................. 42

Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74 ..................................................... 42

Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92.....................................42

Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73 ....................................................... 42

Act of Apr. 16, 1881, § 4, 1881 Ill. Laws 74 ....................................................... 42

Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233 ....................................... 42

Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ................................…42

Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75................................. 42-43

Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33 ...................................................... 42

Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602 ....................................... 42

Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144 ……................... 42

Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32…..................... 42

Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51 ........................................ 42

Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450 ..................................... 43

Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973 .............................. 43

Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442 ..................................... 43

Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61 ................................. 43

Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339 ........................................ 43

Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180-81................................43

Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870 ........................................ 43

Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42 ............................................ 43

Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32 ............................................. 43

Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469 ......................................... 43

Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181 ........................................ 43

Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201 ....................................... 43

Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257 ............................. 43

Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14................................. 43

Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938 ....................................... 43

Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89......................... 43

Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777 ....................................... 43

Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674 ..................................... 43

Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157 ...................................... 43

Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170 ...................................... 43

Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813 ...................................... 43

Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78 .......................................... 43

Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306 ...................................... 43

Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033 ................................... 43

Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671 ........................ 43

Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53 .................................................. 43

Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337 ............................................ 43

Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335 ...................................... 43

Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189 .............................................. 43

Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233 .................................... 43

Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46........................... 43

Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489 ...................................... 43

Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219 .................................. 43

Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76 .................................... 43-44

Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288 ................................ 44

Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138 ...................................... 44

An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881) …………........................................................................ 41

Daniel D. Slate, *Infringed,* 3 J. Am. Const. Hist. 381, 382-387(2025)…………..28

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) ................................................................................................. 40

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) ........... 40

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) ............... 40

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1764) ............... 40

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) ........................................................................................... 39

Penal Code, § 7094, 1895 N.D. Rev. Codes 1259................................................. 42

William Waller Hening, *The New Virginia Justice* 18 (1795) .............................. 40

**STATUTES:**

Wyo. Stat. Ann. §§ 9-1-801 et seq. ....................................................................... 22

Wyo. Stat. Ann. §§ 18-3-301 et seq. ..................................................................... 22

## STATEMENT OF RELATED APPEALS

The government is aware of two other appeals before this Court involving Second Amendment challenges to 18 U.S.C. § 922(o):

- *DeWilde v. Attorney General*, No. 23-8054 (10th Cir.)
- *United States v. Morgan*, No. 24-3141 (10th Cir.)

## INTRODUCTION AND SUMMARY OF ARGUMENT

After showing up drunk and armed with a pistol at an off-duty officer's home, Shobert was arrested for driving while intoxicated. A state court judge required, as a bond condition, that he surrender his firearms during the pendency of the case. But before he could bond out of jail, Shobert suffered an alcohol withdrawal seizure. The Sheriff's Office did not have enough deputies to dedicate one to stay with him in the hospital, so it requested the county attorney seek a medical furlough for Shobert. In turn, the county attorney required that Shobert comply with his bond conditions— specifically relinquishing his firearms—as a condition of seeking the medical furlough to relieve the Sheriff's Office's of its staffing problem. A deputy explained the situation to Shobert, and he consented. A search of his home for firearms revealed three AR-15 type machinegun conversion devices and one Glock pistol equipped with a machinegun conversion device, or "Glock switch."

Before this court, Shobert first contends that the district court committed clear error when it concluded that his consent to search his home was voluntarily given.

In doing so, he argues that the deputy who spoke with him conditioned his continued medical treatment on his consent to search his home. But that contention is unsupported by the record. Instead, both deputies who testified refuted that claim. Shobert also asserts that he was misled into believing that the medical furlough order was conditioned on the surrender of his firearms. But that was true. However, conditioning the medical furlough on Shobert's compliance with is bond conditions did not render his consent involuntary. The medical furlough order had nothing to do with whether Shobert would continue to receive medical care. Instead, it only benefited the Sheriff's Office by relieving its staffing issue. Thus, Shobert was presented with the permissible choice of whether to assist law enforcement without any risk to his continued care. Nothing about that choice rendered his consent involuntary.

In his second issue, Shobert asserts that the machine gun ban in 18 U.S.C. § 922(o) is unconstitutional. As the Supreme Court has recently and repeatedly affirmed, the Second Amendment applies only to firearms that are "in common use . . . for lawful purposes like self-defense," rather than firearms "not typically possessed by law-abiding citizens for lawful purposes," such as "dangerous and unusual weapons." *District of Columbia v. Heller*, 554 U.S. 570, 624-25, 627 (2008) (quotation omitted); *accord New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022); *United States v. Rahimi*, 602 U.S. 680, 691 (2024). Thus, the

district court correctly held that machineguns are not typically possessed by law-abiding citizens for lawful purposes. Instead, they are uniformly restricted, highly lethal and well suited to criminal purposes. States and Congress have heavily regulated machineguns since the first decade of their entry into the civilian market in the mid-1920s. Legally registered machineguns represent a tiny fraction of the firearms possessed in this country today, and those legal machineguns are very expensive and time-consuming to acquire. And § 922(o)'s longstanding prohibition is entirely consistent with the principles underlying our nation's historical tradition, recognized in *Heller*, of regulating dangerous and unusual weapons.

## STATEMENT OF CASE

### I.    Factual Background

On July 27, 2023, Shobert drove himself to the residence of an off-duty officer, Officer Cady, in Worland, Wyoming. (Vol. I at 46-47; Vol. IV at 52-52). Shobert told Officer Cady that he had a theory about a missing persons' case and that he believed he had identified a suspect who was responsible for the disappearance. (Vol. I at 46-47).

Officer Cady's wife and children were in his home. (*Id.*). As he interacted with Shobert, he smelled alcohol and saw a pistol holstered at Shobert's hip. (*Id.* at 46). Shobert, apparently seeing Officer Cady look at the holster, offered to show off his new revolver. (*Id.* at 46). Shobert pulled out the revolver with the barrel directed

toward Officer Cady's home. (*Id*. at 47). Shobert handed the revolver to Officer Cady, who examined it for a moment and gave it back to Shobert. (*Id*. at 47). Shobert struggled to re-holster it. (*See id.*).

In the meantime, Officer Cady texted his wife, telling her to call the police. (*Id*. at 47). Before the police arrived, Shobert discussed "taking matters into his own hands" regarding the missing persons' case, suggesting he could shoot his suspect with his sniper rifle. (*Id*.). Officer Cady continued the conversation, trying to keep Shobert calm. (*Id*.).

Eventually, officers from the Washakie County Sheriff's Office and the Worland Police Department arrived at Officer Cady's home. (Vol. I at 47; Vol. IV at 52). A Washakie County Sheriff's deputy peacefully disarmed Shobert and, ultimately, arrested him for driving while intoxicated. (Vol. I at 47).

The next morning, after sobering up, Shobert appeared before a state court judge. (Vol. II at 21, 41; Vol. IV at 24). The judge entered an order setting bond conditions. (Vol. II at 21-22). Among other things, the conditions required Shobert to post a $1,000 bond; check in daily with law enforcement, and "relinquish all weapons and ammunition to law enforcement." (*Id*.).

Later that morning, Shobert had a seizure at the jail due to alcohol withdrawal. (Vol. IV at 22). Because Shobert remained in custody, Deputy Colleen McClain escorted Shobert to the hospital and stayed there with him. (*Id*. at 18, 28-32). The

Sheriff's Office was very short staffed, with only two deputies working that day. (*Id*. at 32). Once it became clear that Shobert would need to stay at the hospital, Deputy McClain informed the second deputy, Sergeant Michael Oberth, of that fact. (*Id*.). Sergeant Oberth contacted the county attorney about a medical furlough, which would allow Shobert to be left at the hospital unsupervised. (*Id*. at 32, 63).

That afternoon, Sergeant Oberth talked with Shobert at the hospital. (*Id*. at 33). After reminding Shobert of his bond conditions and explaining the Sheriff's Office's staffing situation, Sergeant Oberth requested permission to go into Shobert's home to collect his firearms and ammunition. (*Id*. at 33-35). Shobert consented. (*Id*. at 35).

At Shobert's home, officers found twenty-three firearms, fourteen ammo cans with ammunition, a silencer, and miscellaneous parts and accessories for firearms. (Vol. II at 127). Among this cache, officers found three AR-15 type machinegun conversion devices and one Glock pistol equipped with a Glock switch. (*Id*. at 126). Officers also located an unregistered short-barreled rifle. (*Id*. at 127).

Shobert was discharged from the hospital two days later. (Vol. II at 41). Contrary to the terms of his medical furlough and bond conditions, he failed to return to the jail or otherwise check in with law enforcement. (*Id*.). Instead, he told a family member that he was fleeing the state. (*Id*.). He was arrested approximately four months later. (*Id*. at 124).

## II.     Relevant Procedural History

The grand jury indicted Shobert on two counts. (Vol. I at 11-12). It charged him with possessing machine guns, in violation of 18 U.S.C. § 922(o), and possessing an unregistered short-barreled rifle, in violation of 26 U.S.C. §§ 5861(d) and 5845(a). (*Id*.). Shobert moved to dismiss both charges and sought to suppress the evidence seized from his home. (Vol. I at 15-35; Vol. II at 4-19).

### A.     Proceedings related to Shobert's motion to suppress

In support of his motion to suppress, Shobert argued that he did not voluntarily consent to the officers' warrantless search of his home. (Vol. II at 9-19). He contended that at the time he interacted with Sergeant Oberth at the emergency room, he was in a vulnerable state after his alcohol withdrawal seizure and heavily medicated. (*Id*. at 10-11). He argued that the government would not be able to prove that he did anything other than acquiesce to the search, which was insufficient to show his valid consent. (*Id*. at 12). And even if the government could show he consented, Shobert further contended that the surrounding circumstances of any consent he gave showed it was coerced. (*Id*. at 12).

He asserted that Sergeant Oberth had falsely implied that Shobert was required to consent to the search of his home to comply with the condition of his bond that required him to relinquish his firearms to law enforcement. (*Id*. at 15). Shobert argued that he was not actually on bond at that time, instead, he was on a

medical furlough. (*Id*. at 15-16). Shobert also asserted that Sergeant Oberth implied that his medical treatment was conditioned on agreeing to the search of his home. (*Id*. at 16-17). Therefore, Shobert concluded that he had been coerced.

The government responded, pointing out that whether consent was voluntary was a question of fact to be resolved by the district court. (Vol. I at 48). It asserted that hearing evidence would show that Shobert's consent was not the product of coercion. (*Id*. at 48-49).

The district court held a hearing. (Vol. IV at 14-15). Deputy McClain testified that on the morning of July 28, 2023, she responded to the jail regarding an inmate suffering a seizure. (*Id*. at 22). When she first observed Shobert at the jail, "he was seriously not doing well." (*Id*. at 25). Shobert was placed in a room in the emergency room with a large glass door that allowed general access and observation. (*Id*. at 25-26). Deputy McClain removed Shobert's handcuffs early on to facilitate his medical care. (*Id*. at 27).

After the initial flurry of activity, Deputy McClain sat with Shobert and they talked. (*Id*. at 28). As time passed, he became more and more coherent and was able to recall the events of the previous day. (*Id*. at 28-29). He expressed remorse for his behavior, especially for frightening Officer Cady's family. (*Id*.). Deputy McClain continuously observed Shobert's condition for over two hours in the hospital. (*Id*. at

30). Toward the end of that time, he was "very coherent," and he was able to carry on a normal conversation. (*Id*. at 29, 31).

Deputy McClain explained that the Washakie County Sheriff's Office was very short staffed at the time – there were only two deputies working in the whole county – herself and Sergeant Oberth. (*Id*. at 32). Once she learned that Shobert would need to stay at the hospital, she informed Sergeant Oberth, who told her he would ask for the county attorney's assistance in securing a medical furlough. (*Id*.). Regardless of a medical furlough or a staffing shortage, Deputy McClain testified that it was the jail's policy to ensure that inmates got the medical care they needed. (*Id*. at 43).

Deputy McClain testified that Sergeant Oberth discussed securing Shobert's firearms and ammunition with him at the hospital. (*Id*. at 45). During the conversation, Shobert appeared "[f]ine" and was capable of carrying on a regular conversation. (*Id*. at 44). The conversation occurred with the curtains open, in full view of the nurses' station. (*Id*. at 46). Shobert was not restrained in any way. (*Id*. at 33, 46). The tone was laid back and calm. (*Id*. at 33). Both deputies were in their regular duty uniforms, and no weapons were deployed. (*Id*. at 34). No threats were made. (*Id*. at 34). She testified that Sergeant Oberth "never" told "Shobert he would not receive further medical care if he did not consent to his search." (*Id*. at 35).

Sergeant Oberth testified that when he arrived at the emergency room, Shobert appeared sober and coherent. (*Id*. at 54-55). Sergeant Oberth had no concerns about whether Shobert was able to understand the nature of the questions he was being asked. (*Id*.). He described the conversation as "cordial, consensual." (*Id*. at 56).

Sergeant Oberth explained that because Shobert was in the custody of the jail, a deputy was required to be with him at all times. (*Id*. at 63). The Sheriff's Office did not have the resources to accommodate that need. (*Id*.). Therefore, releasing Shobert on a medical furlough would allow the Sheriff's Office to leave Shobert at the hospital without a deputy. (*Id*.). Sergeant Oberth testified that even if a medical furlough could not be obtained, Shobert still would have received the necessary medical care because the Sheriff's Office would not remove him from the hospital against medical advice. (*Id*. at 63-64).

Sergeant Oberth testified that the reason for the requested search was to "bring [Shobert] into compliance with is bond conditions." (*Id*. at 57, 75). Even though Shobert was to be placed on a medical furlough, Sergeant Oberth testified that Shobert was "still subject to bond conditions." (*Id*. at 58). The county attorney had explained that "to do a medical furlough, he wanted Mr. Shobert to be in compliance with the bond conditions." (*Id*. at 59). The county attorney's main focus was the condition that required Shobert to "relinquish all firearms and ammunition to the sheriff's office for safekeeping . . . during the pendency of his case." (*Id*. at 59). At

the time Sergeant Oberth spoke with Shobert, the furlough order had not yet been prepared. (*Id*. at 62).

At the hospital, Sergeant Oberth explained the staffing problem that the Sheriff's Office was having to Shobert. (*Id*. at 66). He explained to Shobert that to get the medical furlough he would have to relinquish his guns to the Sheriff's Office. (*Id*. at 66). Shobert told Sergeant Oberth that he would like to go with deputies to get his guns because they "were all over the house" and "there were certain items he wanted to take care of." (*Id*. at 66, 75). In response to Shobert's request to accompany officers to his home, Sergeant Oberth expressed his concern that Shobert continue to get the medical treatment that he needed. (*Id*. at 67, 74-75). He explained the staffing problem again. (*Id*. at 75). Then, Shobert consented. (*Id*.).

He also testified that he "[n]ever" threatened "Shobert that if he didn't consent to a search of his home, he was not going to receive further medical treatment." (*Id*. at 56). Instead, Sergeant's Oberth's "conversation with him was strictly focused on the fact that we did not have the personnel to sit on him at the hospital." (*Id*. at 67). He agreed that he told Shobert that in order to relieve the Sheriff's Office's staffing problem with a medical furlough, Shobert would need to allow the officers retrieve his guns and ammunition. (*Id*. at 68). However, he never told Shobert he was required to consent. (*Id*. at 73).

Dr. Craig Lauer attended to Shobert in the emergency room and diagnosed him with an alcohol withdrawal seizure. (*Id*. at 84-85). He explained that immediately post-seizure, most people are confused to the extent that they may not be laying down memories, recognizing their surroundings, or following commands. (*Id*. at 83). He also explained that the extent of the lingering effects on the brain depend on the length and severity of the seizure and the individual. (*Id*. at 81, 90). Dr. Lauer testified that if a patient is "not laying down memories or they seem confused, [he] would not recommend that they make any . . . important life decisions." (*Id*. at 90).

Dr. Lauer prescribed Lorazepam to treat Shobert's alcohol withdraw and prevent further seizures. (*Id*. at 85-86). Lorazepam sedates the patient and can cause drowsiness and confusion. (*Id*. at 86). Dr. Lauer opined that for the two hours Shobert was in the emergency room, he should not have made important decisions. (*Id*. at 90). However, he agreed that if someone was appropriately answering questions they "absolutely" could understand what was going on around them. (*Id*. at 92-93). Further, Dr. Lauer only assessed Shobert's condition right after he appeared in the emergency room. (*Id*. at 104). He acknowledged that Shobert could have become "fully oriented" two hours into his hospital stay. (*Id*. at 102).

The district court denied Shobert's motion to suppress. (Vol. I at 60; Vol. IV at 142 [Tr. of Oral Ruling]). It began by setting out the legal framework for

11

evaluating whether consent has been freely and voluntarily given. (*Id*. at 131-132). In doing so, it emphasized that it had to evaluate the totality of the circumstances. (*Id*. at 132). The district court found that all three witness were credible and that "their testimony was not inconsistent" with each other. (*Id*. at 133).

After addressing the factual background, the court turned to the Shobert's bond conditions. (*Id*. at 133). It held that his bond condition requiring him to relinquish all weapons to law enforcement was "known and valid." (*Id*. at 133, 136). The court found that Shobert was coherent and able to consent to the search of his home. (*Id*. at 137-38). The court found that "while the testimony was back and forth regarding what exactly was stated to Mr. Shobert," two things were clear:

> First, it was clear that Mr. Shobert's medical care and treatment was not conditioned upon him allowing officers to retrieve weapons from his home. There was never any threats or any indications that he could not continue to receive or would not continue to receive that treatment if he did not consent to them removing the firearms.
>
> The second is . . . that the officers did not want to have to be sitting at the hospital, monitoring Mr. Shobert due to manpower issues and the limitations.
>
> On that particular day, I think the testimony was that Deputy McClain and Sergeant Oberth were the only two deputy sheriffs on duty at that time. Thus, that led to Sergeant Oberth conferring with the county attorney and obtaining from the county attorney an order for medical furlough.

(*Id*. at 138). The court found that nothing in the evidence suggested any "motive by law enforcement to search the residence because of a belief of any illegal activity"

and that "there's nothing to suggest . . . that this was a nefarious or an underhanded attempt to gain consent." (*Id*.). Instead, the court found that the concerns over firearms in Shobert's home were reasonable in light of the events leading to his arrest and "the fact that no one would be sitting on him at the hospital." (*Id*. at 139-40).

"Based upon all the facts and the information," the court found that "the Government has shown Mr. Shobert's consent for officers to search his home for firearms and retrieve any firearms found was unequivocal, specific, and voluntarily and freely given." (*Id*. at 140). In support of this finding, the district court further summarized the evidence, finding that "the atmosphere during the conversation was not coercive." (*Id*. at 140-41). The court found that

> Deputy McClain and Sergeant Oberth never threatened Mr. Shobert, nor did they, explicitly or implicitly, as noted, condition his continued medical care and treatment on his consent to remove the firearms from his home. The Court has carefully considered all of the circumstances, including the location of the conversation, the officers' presence, their demeanor, Mr. Shobert's medical condition, the history, and does not find coercion or duress existed.

(*Id*. at 141-42).

## B.    Proceedings related to Shobert's motion to dismiss Count 1

Regarding the machine gun charge, count 1, Shobert argued that the prohibition in § 922(o) on possession machine guns violated the Second Amendment, both facially and as applied to him. (Vol. I at 15-25).  He explained that in *Bruen*, the United States Supreme Court had established a two-part test. (Vol.

I at 15-18). At the first step, courts consider only whether the plain text of the Second Amendment covers an individual's conduct. (*Id*. at 18). Shobert contended that because machine guns were weapons that a person could bear, the Second Amendment applied to his conduct. (*Id*. at 21-22).

At the second step of the test, Shobert explained that courts should determine whether the government can show that a regulation is consistent with the Nation's historical tradition of firearm regulation. (*Id*. at 18). To meet this burden, Shobert asserted that the government was required to show that as of the time of the ratification of the Second Amendment in 1791, there was a similar historical regulation. (*Id*. at 19). Shobert insisted the government could not meet that burden because "[m]achine guns are in common use today for the purpose of self-defense." (*Id*. at 23).

The government responded. (Vol. I at 51-58). The government explained that § 922(o)'s regulation of machine guns did not implicate the Second Amendment at the first step of the analysis because it does not extend to dangerous and unusual weapons. (*Id*. at 52-54). The government asserted that even if the Second Amendment was implicated, regulating machine guns was consistent with the Nation's historical tradition of regulating firearms. (*Id*. at 56-58).

The court denied Shobert's motion. (Vol. IV at 128). It held that the "Second Amendment does not protect those weapons not typically possessed by law-abiding

citizens for lawful purposes" and that "nothing in *Bruen* calls into doubt the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (*Id*. at 126). The court held that machineguns are unusual and dangerous weapons. (*Id*.).

The court was unconvinced by Shobert's argument that because approximately 740,000 machineguns are lawfully possessed, they have sufficiently grown in popularity so as not to be considered unusual:

> According to the most recent United States census, the population in the United States was approximately 331,500,000 in 2020 with population estimates increasing in subsequent years. Based upon those numbers, lawful machine gun ownership equates to less than one quarter of a percent, or .25 percent of the population.

> Although the Court does not venture to estimate the ownership required to establish a particular weapon is in . . . common use . . . for self-defense today, it finds little difficulty in holding that ownership by less than one quarter of 1 percent of the population is insufficient. Possession of a machine gun falls outside of the Second Amendment's commands.

(*Id*. at 127).

The court also found Shobert's as-applied challenge unavailing. (*Id*. at 127). In doing so, it remarked that Shobert had provided "no specific argument or facts as to why Section 922(o) is unconstitutional as applied to him as opposed to other defendants." (*Id*. at 128).

### C.     Shobert conditionally pled guilty and was sentenced

After Shobert's motions were denied, the parties entered a plea agreement in which Shobert agreed to plead guilty to count 1, possession of machine guns, in violation of 18 U.S.C. § 922(o). (Vol. II at 110). He reserved the "right to appeal the adverse determination of motions to dismiss and suppress." (*Id*. at 112). The government agreed to recommend a sentence at the low end of the advisory guidelines range and dismiss count 2, possession of an unregistered short-barreled rifle. (*Id*. at 113-14). The district court sentenced Shobert to 18 months of imprisonment. (Vol. I at 65; Vol. IV at 183).

Shobert timely appealed. (Vol. I at 72-73).

## ARGUMENT

### I.     Shobert voluntarily consented to the search of his home for firearms and ammunition.

Shobert contends that his consent was involuntary for two reasons. (Aplt's Br. at 13). He contends that Sergeant Oberth implied that Shobert's medical care was conditioned on receiving a medical furlough. (*Id*. at 13, 15-19). He also argues that Sergeant Oberth misled him to obtain his consent. (*Id*. at 13-15). Neither assertion is supported by the record. Instead, the record supports the district court's factual determination that Shobert voluntarily consented.

## A.    Standard of Review

When reviewing a district court's denial of a motion to suppress, this court accepts the district court's factual findings unless they are clearly erroneous, viewing the evidence in the light most favorable to the district court's finding. *United States v. Harrison*, 639 F.3d 1273, 1277 (10th Cir. 2011). Whether consent was voluntarily given is a question of fact this court reviews for clear error. *Id.* The clear error standard applies because the district court is in the best position to judge the credibility of the witnesses, the weight of the evidence, and the reasonable inferences drawn from it. *Id.* Thus, "if there is 'any rational basis' for the district court's finding" on the voluntariness of consent, this court "must affirm." *United States v. Kimoana*, 383 F.3d 1215, 1225 (10th Cir. 2004) (quoting *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998)).

## B.    The totality of the circumstances show that Shobert's consent was voluntarily given.

Warrantless searches are per se unreasonable under the Fourth Amendment unless they fit a recognized exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent is one such exception. *Id.* This court evaluates consent in two steps. *United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018). First, there must be either express or implied consent. *Id.* Second, that consent must be freely and voluntarily given. *Id.* Shobert does not dispute that he

expressly consented to the search of his home. He contends only that his consent was involuntary. (Aplt's Br. at 11-21).

Consent to search must be voluntary and "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. Voluntariness is determined under the totality of the circumstances. *Id.* at 226. This court has listed a number of relevant considerations when examining the totality of the circumstances:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent[.]

*United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012). A defendant need not have perfect mental ability to give voluntary consent to search. *United States v. Quezada-Lara*, 831 F. App'x 371, 376 (10th Cir. 2020) (unpublished). And a defendant may also voluntarily consent while detained. *Latorre*, 893 F.3d at 756.

### 1. Shobert's medical care was not conditioned on his consent or a medical furlough.

The district court found that "it was clear that Mr. Shobert's medical care and treatment was not conditioned upon him allowing officers to retrieve weapons from his home." (Vol. IV at 138). That finding is supported by the record.

Both Sheriff's deputies testified that Shobert would continue to receive the care that he needed regardless of his consent to seize his firearms or a medical furlough. Deputy McClain stayed with Shobert for over two hours at the hospital and observed the conversation about the search. She testified that Sergeant Oberth "never" told Shobert that "he would not receive further medical care if he did not consent to [the] search" and that there was never any threat to withhold medical care. (*Id*. at 35). She also testified that regardless of a medical furlough or a staffing shortage, the jail would ensure that inmates got the medical care they needed. (*Id*. at 43).

Sergeant Oberth echoed Deputy McClain's testimony about his conversation with Shobert. He testified that he "[n]ever" threatened "Shobert that if he didn't consent to a search of his home, he was not going to receive further medical treatment." (*Id*. at 56). Instead of the subtle threats that Shobert insists occurred, Sergeant Oberth's testimony describes a "cordial, consensual conversation," (Vol. IV at 56), in which he requested Shobert consent for the benefit of the Sheriff's Office.

The purpose of the medical furlough was to relieve the Sheriff's Office's staffing issue. It had nothing to do with Shobert's medical care. Sergeant Oberth explained that because Shobert was in the custody of the jail, a deputy was required to stay with him. (*Id*. at 63). The Sheriff's Office did not have the resources to

accommodate that need, so it "was really needing Mr. Shobert to be released on a medical furlough." (*Id*.). Deputy McClain repeated these sentiments. (*Id*. at 32). Both deputies testified that regardless of whether a medical furlough could be obtained, Shobert would receive the care he needed. (*Id*. at 43, 63-64). Sergeant Oberth was simply being "very transparent" with Shobert by explaining the staffing problem he was seeking to solve. (*Id*. at 66). By doing so, he did not convert an honest conversation into nefarious coercion.

Arguing against this conclusion, Shobert assumes that because medical care, the Sheriff's Office's need for a medical furlough, and firearm relinquishment were all part of the same conversation that Shobert must have understood that his medical care was conditioned on his consent. (Aplt's Br. at 15-19). But his assumptions are not born out in the record before the district court.

Attempting to overcome this, Shobert cites Sergeant' Oberth's report, which he acknowledges is not part of the record, let alone the sworn testimony. (Aplt's Br. at 16-17 & n.4). But the district court could hardly be faulted for making its findings of fact and credibility determinations based on its opportunity to evaluate Sergeant Oberth's testimony in person and make a credibility determination after cross examination. Even so, the phrase from Sergeant Oberth's report, quoted in Shobert's motion to suppress, does not bear the weight Shobert places on it. Instead, the phrase strings together in short form the medical furlough, consent, and medical treatment.

But the testimony pulled those concepts apart, explaining the sequence of events and the conversation in context.

Similarly, Shobert mischaracterizes the testimony when he asserts that Sergeant Oberth needed Shobert's consent so that Shobert could continue to receive the care he needed. (Aplt.'s Br. at 16). Instead, when asked for consent, Shobert expressed a desire accompany officers, which would have included leaving the hospital. (Vol. IV at 66). It was only in response to Shobert's suggestion that he leave the hospital, necessarily interrupting his treatment, that Sergeant Oberth expressed concern that Shobert continue receiving the treatment that he needed. (*Id.* at 67). Noting about this exchange conditioned Shobert's continued care on his consent. Again, the testimony pulled those concepts apart, explaining the sequence of events and the conversation in context. And a review of the testimony, especially when viewed in the light most favorable to the district court's ruling, shows the district court did not commit clear error when it found that Shobert's medial care was not conditioned on the Sheriff's Office receiving a medical furlough or his consent to search.

## 2. Sergeant Oberth did not mislead Shobert.

The medical furlough was conditioned on Shobert's compliance with his bond conditions. Consequently, Sergeant Oberth did not make any false statements to Shobert in the conversation leading to his consent to search when he told him as

much. Consistent with this, the district court determined that nothing nefarious or underhanded occurred, (Vol. IV at 139 [Oral Ruling]), and that finding is supported by the record.

Sergeant Oberth testified that in order for the Sheriff's Office to receive the medical furlough, Shobert had comply with his bond conditions, including relinquishing his firearms. (Vol. IV at 58-61, 66-68). He explained that it was the county attorney that imposed that condition on receiving the medical furlough. (*Id*. at 59, 61, 66-67). And that makes sense. Sergeant Oberth was not a lawyer and had no part in preparing the motion or order. (*Id*. at 62, 72). Instead, the motion was prepared by the county attorney. (Vol. II at 35-36).

There was nothing wrong with the county attorney conditioning the motion for a medical furlough on Shobert's compliance with the bond conditions, especially relinquishing his firearms. A county attorney is an elected official charged with ensuring public safety as a prosecutor. Wyo. Stat. Ann. §§ 18-3-301 et seq.; Wyo. Stat. Ann. §§ 9-1-801 et seq. And the district court found that it was reasonable to be concerned about Shobert's access to firearms and public safety in light of the events that led to Shobert's arrest. (Vol. IV at 139-140). Therefore, it was entirely reasonable for the county attorney to seek some assurance of public safety by seeking compliance with Shobert's legitimate bond conditions before seeking his release on

a promise of good behavior. Unfortunately, that turned out to be a prudent precaution because Shobert did not comply and, instead, fled. (Vol. II at 41).

Conditioning the medical furlough on Shobert's compliance with his bond conditions did not render his consent involuntary. As explained above, the medical furlough benefited the Sheriff's Office, not Shobert. Shobert would have received his medical treatment regardless of his consent to the search of his home. Consequently, the choice he was presented with was whether or not he would give his consent to help out the Sheriff's Office. Nothing about that choice would put the kind of pressure on him that might overbear his will. Nor is it the kind of impermissible inducement this court was concerned about in *Harrison.*

In *Harrison*, law enforcement officers falsely told the defendant that they had received a tip that there were drugs and bombs in the apartment in which he was staying. *Harrison*, 639 F.3d, 1276. This court characterized the deception as leading the defendant to reasonably believe that "he and others were at risk of harm if there actually was a bomb in the apartment. This would have left him with two options: (1) deny consent to search and accept the risk that a bomb had been planted in the apartment; or (2) consent to the search." *Id*. at 1280. In light of those choices, his consent was coerced. *Id*. Thus, the "operative question is whether 'deceit or trickery is used to imply an individual has no ability to refuse consent.'" *United States v. Woody*, 45 F.4th 1166, 1176 (10th Cir. 2022) (citing *Harrison*, 639 F.3d at 1280).

Like the defendant in *Harrison*, Shobert had two choices: (1) deny consent and receive his medical care while a Deputy McClain sat with him, or (2) consent and receive his medical care while relieving the Sheriff's Office's staffing problem. No deceit or tricky was involved. Regardless, nothing about this choice implied that Shobert could not refuse. And the district court found that nothing about the atmosphere it was presented in made it coercive. (Vol. IV at 140).

Arguing to the contrary, Shobert suggests that he was in a vulnerable state when Sergeant Oberth requested his consent. (Aplt's Br. at 14). However, both deputies testified that Shobert had substantially recovered from his seizure such that they had no concerns when interacting with him. (Vol. IV at 29, 31, 44, 54-56). Even Dr. Lauer, who was called to testify by Shobert, agreed that Shobert could become fully oriented by the time Sergeant Oberth sought consent. (*Id*. at 102). Thus, nothing about the record supports Shobert's assertion that he was somehow too vulnerable to choose whether or not he should do the Sheriff's Office a favor.

At worst, the record supports the inference that Shobert may have been subjectively motivated to consent to a favor for law enforcement. The district court found that Shobert knew and was friendly with law enforcement in his small town. (Vol. IV at 133). And Shobert expressed remorse for frightening an off-duty officer and his family. (*Id*. at 28-29). Together, these facts support the inference that he may have wanted to help the Sheriff's Office with its staffing problem. But his disposition

toward law enforcement is not the kind of subjective characteristic that could render his consent involuntary. *United States v. Zapata*, 997 F.2d 751, 759 (10th Cir. 1993). And an altruistic motive that deputies made no effort to exploit could hardly vitiate voluntary consent.

In sum, the district court considered the totality of the circumstances, weighed the credibility of the witnesses, and found that Shobert's consent was voluntary. Because the record supports its determination, it did not commit clear error.

## II. Prohibitions on machine guns are constitutional.

Shobert contends that machine guns are common weapons of self-defense. (Aplt's Br. at 23-28). He therefore concludes that they are protected by the Second Amendment and that he cannot constitutionally be prohibited from possessing them. (*Id.*). Below, the district court correctly rejected this argument. (Vol. IV at 127-28). In doing so, it held that nothing in *Bruen* called into doubt the historical tradition of prohibiting the carrying dangerous and unusual weapons. (*Id.* at 126). It also correctly concluded that even though approximately 740,000 machine guns are lawfully possessed in the United States, machine guns are not common self-defense weapons protected by the Second Amendment. (*Id.* at 127).

### A. Standard of Review

This Court reviews de novo a constitutional challenge to a statute. *United States v. Cox*, 906 F.3d 1170, 1178-79 (10th Cir. 2018).

This court may affirm on any basis that is supported by the record. *United States v. Martinez*, 92 F.4th 1213, 1258 (10th Cir. 2024). And a party may "provide new legal authority on appeal for the position that [it] advanced below." *Baca v. Department of the Army*, 983 F.3d 1131, 1140 (10th Cir. 2020) (quotation marks and brackets omitted).

### B.    Statutory Background

Subject to two narrow exceptions, § 922(o) makes it "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). The first exception is for machineguns transferred or possessed by government entities. § 922(o)(2)(A). The second is for machineguns that were lawfully possessed before the statute's effective date in 1986. 18 U.S.C. § 922(o)(2)(B). Section 922(o)'s enactment as part of the Firearm Owners' Protection Act in 1986 thus "capped" civilian ownership "at pre[-]1986 levels." *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023).

A "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(24) (incorporating definition from Title 26). The term also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b).

**C.** **Section 922(o) is a constitutional restriction on the mode or manner of fire.**

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment "protect[s] an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). The right, however, "was never thought to sweep indiscriminately." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

When considering whether a firearm regulation is constitutional, the appropriate test is based on "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 17. But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92. Instead, the modern law "must comport with the principles underlying the Second Amendment." *Id*. at 692. "Why and how the regulation burdens the right are central to this inquiry." *Id.*

The founding generation distinguished between a valid regulation and an impermissible "infringement" of the right to keep and bear arms. *See* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 382-387 (2025). A restriction could amount to an unconstitutional infringement if (among other reasons) it serves an illegitimate purpose, burdens the right more severely than necessary to serve a valid purpose, or broadly negates the right. *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1489 (2024).

Under this framework, § 922(o) is a constitutional restriction on the mode or manner of fire. The statute does not broadly negate the right to keep and bear arms. It does not even ban a particular class of weapons—such as rifles, pistols, or shotguns—but instead requires that weapons of all classes be configured for semiautomatic rather than fully automatic fire. Indeed, the federal definition of "machinegun" focuses solely on the mode of fire (firing more than one shot with a single function of the trigger) and not on any other characteristics of the firearm. 26 U.S.C. § 5845(b). And, far from serving an illegitimate purpose, § 922(o) reasonably restricts the automatic mode of fire because of its potential to cause serious harm by indiscriminately spraying bullets over a wide area.

As a restriction on the mode of fire, § 922(o) is unlike the law that the Supreme Court held unconstitutional in *Heller*, 554 U.S. at 630, which was a "complete prohibition" on handguns, "the most popular weapon chosen by Americans for self-

defense in the home." Instead, § 922(o) operates more like historical laws prohibiting the concealed carry of firearms. As the Supreme Court has explained, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* at 626. Although "the history reveals a consensus that States could not ban public carry altogether," the historical evidence "demonstrate[s] that *the manner* of public carry was subject to reasonable regulation" and states could "lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly," *Bruen*, 597 U.S. at 53, 59 (emphasis omitted).

Section 922(o) is a permissible "manner" restriction analogous to those historical laws. The statute does not prevent Shobert from possessing AR-15 rifles or Glock pistols configured for semiautomatic fire. Instead, it prohibits only the possession of firearms configured to fire automatically and of conversion devices such as those Shobert possessed here. The statute does not violate the Second Amendment.

### D. The Second Amendment does not protect firearms that are not typically possessed by law-abiding citizens for lawful purposes.

Even if § 922(o) is viewed as a restriction on a class of firearms, as opposed to simply a restriction on the manner of fire, it is still consistent with the Second Amendment. The Supreme Court has recognized an "important limitation on the

right to keep and carry arms"—"the sorts of weapons protected [a]re those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Put another way, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. Courts cannot look at the Amendment's text in isolation but must instead consider the text "according to the understandings of those who ratified it," *Bruen*, 597 U.S. at 28. And, as *Heller* explained, the right to bear arms was not understood in 1791 as "a right to keep and carry any weapon whatsoever," *Heller*, 554 U.S. at 626, but only as a right to possess firearms "'in common use at the time,'" *id*. at 627.

Heller went on to hold that the textual "common use" limitation also "accords with the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. The Court explained that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627. Thus, whether as a matter of text, history, or both, firearms that are not "in common use" for "lawful purposes" are unprotected.

The Supreme Court first applied the "common use" limitation in *Miller*, which upheld convictions for possession of unregistered short-barreled shotguns in violation of the National Firearms Act. *Miller*, 307 U.S. at 179. The *Miller* Court said it could not conclude that "the Second Amendment guarantees the right to keep

and bear [a short-barreled shotgun]," which was not "part of the ordinary military equipment." *Id*. at 178. Subsequently, *Heller* explained that *Miller's* reference to "ordinary military equipment," "[r]ead in isolation," might be taken to mean that "only those weapons useful in warfare are protected." *Heller*, 554 U.S. at 624. But *Heller* rejected that "startling reading" of *Miller*, which "would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id*. Instead, *Heller* read *Miller* as holding that the Second Amendment protects the kinds of weapons used for militia service at the founding, that is, "arms 'in common use at the time' for lawful purposes like self-defense." *Id*. (quoting *Miller*, 307 U.S. at 179).

*Bruen* did not call into question *Miller* and *Heller's* "common use" limitation. *Bruen* explained that *Heller* had "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Bruen*, 597 U.S. at 21. "For example," *Heller* had "found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"'" that the Second Amendment applies to weapons that are "in common use at the time." *Id*. (quoting *Heller*, 554 U.S. at 627). Later, *Bruen* again mentioned that, "[d]rawing from this historical tradition," *Heller* had "explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id*. at 47 (quoting *Heller*, 554

U.S. at 627). *Rahimi* too recognized that some jurisdictions at the founding "banned the carrying of 'dangerous and unusual weapons.'" *Rahimi*, 602 U.S. at 691. Accordingly, the Supreme Court has established that, consistent with the principles underlying the Second Amendment, the government may regulate firearms not typically possessed by law-abiding citizens for lawful purposes, such as dangerous and unusual weapons.

**E.     Machineguns are not in common use for lawful purposes.**

Machineguns are not protected by the Second Amendment because they are not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, 627, but are instead "adapted for unlawful uses," *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116-17 (10th Cir. 2024). As the Court recently confirmed, "[w]hy and how the regulation burdens the right" remain "central to th[e Second Amendment] inquiry." *Rahimi*, 602 U.S. at 692. Similarly, considering whether a firearm is "dangerous and unusual" necessarily requires considering the danger that the firearm poses. *See United States v. Price*, 111 F.4th 392, 406 (4th Cir. 2024) (en banc).

Since *Heller*, multiple courts of appeals have upheld § 922(o) on the basis that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes." *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *see United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822

F.3d 136, 142 (3rd Cir. 2016) (machineguns are "not in common use for lawful purposes"); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns are dangerous and unusual and therefore not in common use."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (observing that "[a] machine gun is 'unusual'" and that "[o]utside of a few government-related uses, machine guns largely exist on the black market"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (challenge to § 922(o) was "foreclosed" by Heller's statement that "'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (unpublished) (same).

The reasoning of those courts is supported by the relevant evidence. Machineguns are extraordinarily lethal. The Supreme Court has recognized "[t]he immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). As the Ninth Circuit has explained, "[a] modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. Thus, "[s]hort of bombs, missiles, and biochemical agents," that court could "conceive of few weapons that are more dangerous than machine guns." *Id.*

Moreover, machineguns are "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from

denial of certiorari); *see Polis*, 121 F.4th at 116-17 (observing that "the Second Amendment does not extend to weapons" that are "adapted for unlawful uses"). As Congress has observed, machineguns are "used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954), and are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. Rep. No. 99-495, at 4 (1986).

The legislative landscape reflects this judgment and indicates that machineguns are not in common use for lawful purposes. A supermajority of states—39 at last count—prohibit or strictly regulate the possession of machine guns by private parties. Breaking that number down, twelve states and the District of Columbia prohibit the possession of machineguns by private persons, regardless of whether they are properly registered under the National Firearms Act.[1] Another 25 states regulate or ban private machinegun possession while providing an exception or affirmative defense for machineguns possessed in compliance with federal law.[2]

---

[1] Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code Ann. tit. 11, § 1444(a)(5); D.C. Code Ann. § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Iowa Code §§ 724.1, 724.3; Mass. Gen. Laws ch. 140, § 131(o); Minn. Stat. § 609.67, subd. 2; N.J. Stat. Ann. § 2C:39-5(a); N.Y. Penal Law § 265.02(2); R.I. Gen. Laws § 11-47-8(a); Wis. Stat. § 941.26(1g)(a).

[2] Alaska Stat. § 11.61.200(a)(3), (c), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3), (F); Ark. Code Ann. §§ 5-73-204, 5-73-205; Conn. Gen. Stat. § 53-202(g), (h); Fla. Stat. § 790.221; Ga. Code Ann. §§ 16-11-

And two states, without mentioning federal law, require registration of machineguns and make their public carry presumptively unlawful.[3] Thus, unlike with commonly owned firearms such as handguns, there is a nationwide legislative consensus of prohibiting or severely restricting the possession of machineguns.

Statistical evidence also shows that machineguns are not typically possessed by law-abiding citizens for lawful purposes. Below, the district court focused on the total of 740,000 machine guns lawfully possessed in the United States, holding that number did not amount to common use. (Vol. IV at 126-27). Using that number ignores the fact that most of those machine guns are registered to government entities. The actual number in civilian hands, that could with some small amount of plausibility be called self-defense weapons, is much smaller.

---

122, 16-11-124; Ind. Code §§ 35-47-5-8, 35-47-5-10; Kan. Stat. Ann. § 21-6301(a)(5), (h); La. Stat. Ann. § 40:1752; Me. Stat. tit. 17-A, §§ 1051, 1052; Mich. Comp. Laws § 750.224(1), (3)(c); Mo. Rev. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350(1)(b); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17(A), (C)(5); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330; S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3), (d); Tex. Penal Code Ann. § 46.05(a)(1)(B); Wash. Rev. Code § 9.41.190(1), (4); W. Va. Code § 61-7-9.

[3] Md. Code Ann., Criminal Law §§ 4-403, 4-404, 4-405; Va. Code Ann. §§ 18.2-290, 18.2-291, 18.2-295.

As of 2016, there were "175,977 pre-1986 civilian-owned machineguns in existence." *Hollis*, 827 F.3d at 449 (citing ATF statistics); *see* Record on Appeal at 167, *DeWilde v. Attorney General*, No. 23-8054 (10th Cir.) (2016 ATF letter). That is a tiny fraction of the 300 million to 500 million privately owned firearms in the United States. [4] And it pales in comparison even to the number of firearms manufactured in and imported into the United States every year, which has exceeded 20 million in recent years.[5] Moreover, those approximately 176,000 civilian-owned machineguns are not spread over 176,000 civilians, because many are amassed by collectors who own multiple machineguns.[6] But even assuming (wrongly) that those machineguns were spread among 176,000 civilians, only one in 1,908 Americans—

---

[4] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/ (estimate of 494 million); Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers, at 4 (June 2018), https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf (estimate of 393 million); John Berrigan, et al., *The Number and Type of Private Firearms in the United States*, Annals of the American Academy of Political and Social Science, Vol. 704, Issue 1, at 82 (Nov. 2022) (estimate of 326 million in 2019).

[5] *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/.

[6] *See* Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of the 630,000 in the U.S.* (Dec. 21, 2018), https://www.boisestatepublicradio.org/news/2018-12-21/automatic-weapons-are-legal-but-it-takes-a-lot-to-get-one-of-the-630-000-in-the-u-s (interviewing a collector with more than 20 machineguns).

roughly 0.05% of the population—would legally own a machinegun,[7] compared to the roughly one in three Americans who owns a firearm.[8]

Given the fixed supply of pre-1986 machineguns, the cost of a privately registered machinegun is extremely high. "[T]oday, a transferable M16 costs nearly $30,000 while 'entry-level' machine guns cost in the ballpark of $10,000." Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273, 285 (2022). The current wait time for such a transfer (accomplished using ATF Form 4) is 137 days for paper forms and 28 days for electronic forms. *Id*. at 289 & n.81; ATF, Current Processing Times, https://www.atf.gov/resource-center/current-processing-times (as of Dec. 1, 2024). The limited number of pre-1986 machineguns in civilian hands, their high cost, and the difficulty of acquiring them all indicate that they are not "in common use" or "typically possessed by law-abiding citizens." *Heller*, 554 U.S. at 624-25, 627.

Accordingly, the other circuits to consider the question have all agreed that machineguns not typically possessed by law-abiding citizens for lawful purposes

_____

[7] *See* U.S. Census Bureau, Happy New Year 2024!, https://www.census.gov/library/stories/2023/12/happy-new-year-2024.html (estimating a population of 335,893,238).

[8] *See* Pew Research Center, Key facts about Americans and guns, https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/.

and are instead "dangerous and unusual." *See Fincher*, 538 F.3d at 874; *Hollis*, 827 F.3d at 451; *One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d at 142-44; *Henry*, 688 F.3d at 640. Indeed, *Heller* itself observed that it would be "startling" to conclude that "restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624. This Court should follow *Heller* and other circuits in holding that machineguns are not "typically possessed by law-abiding citizens for lawful purposes," but are instead "dangerous and unusual." *Id*. at 625, 627 (quotation omitted).

F. **Section 922(o) is consistent with the historical principle that the government may ban dangerous and unusual weapons.**

Because it prohibits possession only of firearms that are not typically possessed by law-abiding citizens for lawful purposes, § 922(o) is "consistent with the principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. As *Heller* explained, the "common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing 12 historical sources). Thus, *Heller* has already authoritatively established this principle, *see Rahimi*, 602 U.S. at 692, and this Court

need not sift through any additional historical sources to double-check the Supreme Court's work.[9]

In any event, an array of historical laws confirms the principle that *Heller* recognized. In England, the 1328 Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 41-45. This statute was understood to provide that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787); *see Rahimi*, 602 U.S. at 697-98. In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

---

[9] This is not to say that the historical evidence does not support other constitutional principles justifying firearm regulation. *See Rahimi*, 602 U.S. at 702 (declining, like prior cases, to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" (quoting *Bruen*, 597 U.S. at 31)). For present purposes, however, the principle that governments may ban firearms that are not in common use for lawful purposes is sufficient to dispose of this case.

The American colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47; *see Heller*, 554 U.S. at 627. Early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[10] Colonial Massachusetts (1692) and New Hampshire (1701) codified this authority, providing that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . by night or by day, in fear or affray of their majesties' liege people."[11] In the late-18th century, the Commonwealth of Virginia (1786) similarly provided that no person shall "ride armed by night nor by day, . . . in terror of the Country,"[12] and the Commonwealth of Massachusetts (1795)

---

[10] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[11] *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904).
[12] Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

later again directed justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[13] Confirming that these early laws targeted not just "terror" but also dangerousness, the province of East New Jersey (1686) prohibited the *concealed* carry of "unusual and unlawful weapons."[14] Although these statutes contemplated that an affray required "something more" than merely carrying any firearm in public, *Bruen*, 597 U.S. at 50, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *see id.* at 46-47.

Throughout the 1800s, states adopted restrictions on a wide variety of dangerous and unusual weapons. For example, many states banned the sale, carry, or concealed carry of dangerous knives such as Bowie knives, Arkansas toothpicks, dirks, and daggers.[15] Many states also banned the possession, sale, carry, or

---

[13] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

[14] An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

[15] *See, e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200; Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76; Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148-49; Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148; Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129; Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56-57; Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex.

concealed carry of blunt weapons such as slung shots, brass knuckles, and billy clubs.[16] Consistent with a colonial New Jersey (1771) statute that made it a crime to "set any loaded Gun . . . intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance,"[17] various states in the 19th and 20th centuries criminalized the setting of "trap guns."[18]

---

Gen. Laws 25; Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17; Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724; Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175; Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231; Act of May 24, 1879, § 1, 1879 Ill. Laws 114-15; Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48; Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92; Act of April 16, 1881, § 4, 1881 Ill. Laws 74; Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33; Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602; Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32; Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51.

[16] *See, e.g.*, Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404; Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26; Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32.

[17] Act of December 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346.

[18] *See, e.g.*, Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137; Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35; Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51; Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136; Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75; Penal Code, § 7094, 1895 N.D. Rev. Codes

In the mid-1920s, light, portable machineguns such as the Thompson submachine and the Browning Automatic Rifle became publicly available in the United States and began to be used by gangsters and criminals. *See* Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 60-63 (2023). Between 1925 and 1934, at least half the states responded to this societal problem by enacting anti-machinegun laws, including comprehensive bans.[19] Congress, too, responded to the "law violator" and

_____

1259; Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450; Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973; Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61; Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339; Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180-81; Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870; Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42; Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78; Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671; *see* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442.

[19] *See* Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act

"his most dangerous weapon," S. Rep. No. 73-1444, at 1-2 (1934), by enacting the National Firearms Act 1934, which imposed a $200 tax on machineguns and required that they be registered with the federal government, *see* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845(a)-(b). The $200 tax was prohibitively expensive to most Americans, as it was "equivalent to nearly $4,500 today." W. Kip Viscusi & Kyle J. Blasinsky, *Leveraging Public Support for Gun Laws to Reduce Mass Shootings*, 2024 U. Ill. L. Rev. 707, 755 (2024). The taxing and registration system made it more difficult for "the criminal class" to obtain the weapons and made it easier to "convict [criminals] when they have the weapons." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. at 6, 12, 22 (statement of Attorney General Homer Cummings).

In 1986, Congress adopted § 922(o) as part of the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (1986). That provision "effectively freezes the number of legal machine guns in private hands at its 1986 level," *United States v. Kenney*, 91 F.3d 884, 885 (7th Cir. 1996), by making it illegal for "any person to transfer or possess a machinegun" unless the transfer or possession is (a) under the authority of a government entity or (b) involves a

------------------------

of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.

"machinegun that was lawfully possessed" before 1986, 18 U.S.C. § 922(o)(2)(A), (B). The transfer of a pre-1986 machinegun continues to be subject to a $200 tax. 26 U.S.C. § 5811(a).

Section 922(o) is consistent with the principles underlying this longstanding tradition of firearm regulation. English and American jurisdictions restricted the carrying of dangerous and unusual weapons even before the founding era. *See Rahimi*, 602 U.S. at 691. States restricted a variety of such weapons throughout the 1800s, apparently without "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. And many states—followed quickly by the federal government—began regulating machineguns within a few years of their entry into civilian use. Section 922(o) is therefore part of a tradition of weapons regulation that goes back to the founding. And this longstanding tradition shows that the government may ban firearms not typically possessed by law-abiding citizens for lawful purposes, such as dangerous and unusual weapons. *See Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring) ("Post-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding—can be probative of the meaning of vague constitutional text.").

Post-ratification history is particularly relevant given that machineguns are largely a 20th-century innovation. As *Bruen* recognized, "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach"

to the analogical inquiry. *Bruen*, 597 U.S. at 27. The invention of machineguns—particularly lightweight and publicly available machineguns—represented a dramatic technological advancement. Guns in the 18th century generally fired only one shot, often misfired, and took a long time to load. See Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019).

The 1920s, however, saw the introduction of firearms like the Browning Automatic Rifle and Thompson submachine gun, which were lightweight, maneuverable, and could fire automatically at rates exceeding 600 rounds per minute from magazines containing at least 20 (and up to 100) rounds. Spitzer, *supra*, 51 Fordham Urb. L.J. at 61-63. The availability of such machineguns in the civilian market brought with it new societal concerns, including the use of such weapons by gangsters and other criminals. *Id.* at 62-63. The fact that many states and the federal government quickly responded to these societal and technological developments with laws regulating machineguns—and the absence of "disputes regarding the lawfulness of such prohibitions," *Bruen*, 597 U.S. at 30—indicates that § 922(o) is consistent with the longstanding tradition of regulating dangerous and unusual weapons. As Justice Kavanaugh explained in *Rahimi*, state and federal laws and practices "over time" have "often reflected and reinforced common understandings

of the Constitution's authorizations and limitations." *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

In sum, machineguns are unprotected by the Second Amendment. The uniform precedent of other circuits, a century-old legislative consensus regulating machineguns, statistics about the number of legally owned machineguns, and courts' common-sense acknowledgement that machineguns are highly dangerous demonstrate that regulation of machine guns are facially constitutional. Shobert made no distinction before the district court as to why his situation may be different (Vol. IV at 127-28), and he has failed to do so here. Consequently, both is facial and as-applied challenges to 18 U.S.C. § 922(o) fail.

## CONCLUSION

On the basis of all the foregoing, the Appellant's conviction must be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument would not materially assist the

court in resolving the issue presented on appeal.

**DATED** this 28th day of May, 2025.

Respectfully submitted,

STEPHANIE I. SPRECHER
Acting United States Attorney

By:     /s/ *Christyne M. Martens*
        Christyne M. Martens
        Assistant United States Attorney
        P.O. Box 22211
        Casper, Wyoming 82602
        307-261-5434
        christyne.martens@usdoj.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

As required by Rule 32(g), Fed. R. App. P., I certify that this brief is proportionally spaced in Times New Roman font size 14 and contains 10,256 words. I relied on my word processor and Microsoft Word 2016 software to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

/s/ *Christyne M. Martens*
CHRISTYNE M. MARTENS
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on 28th day of May, 2025, I electronically filed the foregoing **Brief of Appellee** using the court's CM/ECF system, which will send notification of such filing to Jon W. Grevillius at Jon_Grevillius@fd.org.

/s/ *Heidi M. Mason*
UNITED STATES ATTORNEY'S OFFICE