**Case No. 24-8058**

In the United States Court of Appeals
for the Tenth Circuit

**United States of America**,
Plaintiff-Appellee,

v.

**Steven Shobert,**
Defendant-Appellant.

On Appeal from the United States District Court
for the District of Wyoming
The Honorable Scott W. Skavdahl, District Judge
D.C. Case No. 2:23-CR-00153-SWS-1

**Appellant's Reply Brief**

Office of the Federal Public
Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192
Email: Jon_Grevillius@fd.org

Virginia L. Grady
Federal Public Defender

Jon W. Grevillius
Assistant Federal Public Defender

Attorneys for Appellant
Steven Shobert

July 16, 2025

# Table of Contents

Table of Authorities ................................................................................. iii

Argument ............................................................................................... 1

1. The district court clearly erred in concluding that Mr. Shobert voluntarily consented to the search of his home. ........................... 1

    A.   The record does not show that the county attorney unilaterally imposed an unwritten condition that Mr. Shobert comply with bond conditions during his entire stay in the hospital. ...................................................................... 2

    B.   The testimony shows that Sergeant Oberth implied to Mr. Shobert that his treatment would be affected if he did not get a medical furlough. ................................................................... 9

2. 18 U.S.C. § 922(o) is unconstitutional. ......................................... 14

    A.   Section 922(o) does not simply restrict the "mode or manner" of firearms use. ...................................................................... 14

    B.   The Government's argument that machine guns are not in "common use for lawful purposes" fails. ................................. 16

    C.   The government does not show there is a historical tradition that is relevantly similar to a ban on the possession of machine guns. ........................................................................ 19

        (i) "Going armed" laws are not relevantly similar to a ban on machine gun possession in the home. ................................. 19

        (ii) State bans on "blunt weapons" are not relevantly similar to a ban on machine gun possession. ................................... 20

        (iii) A historical tradition of machine gun regulation does not make a categorical ban on machine gun possession constitutional. ................................................................. 21

Conclusion ........................................................................................... 24

Certificate of Compliance ......................................................................25

# Table of Authorities

**Cases**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................. 16, 17, 22

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) 18-19, 22

*Plaza Speedway Inc. v. United States*, 311 F.3d 1262 (10th Cir. 2002) ... 9

*United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011) ..................... 8

*United States v. Nichols*, 229 F.3d 975 (10th Cir. 2000) ....................... 13

*United States v. Rahimi*, 602 U.S. 680 (2024) ................................. 16, 19

**Statutes**

18 U.S.C. § 922(o) ...........................................14, 15, 17, 18, 19, 20, 22, 23

26 U.S.C. § 5845(b) ................................................................ 15

Cal. Penal Code § 32625(a) ...................................................... 22

Cal. Penal Code § 32650 .......................................................... 22

Cal. Penal Code § 32655 .......................................................... 22

Colo. Rev. Stat. § 18-12-102(5) ................................................. 22

N.J. Stat. Ann. § 2C:39-5 ......................................................... 22

N.J. Stat. Ann. § 2C:58-5 ......................................................... 22

National Firearms Act of 1934,
    Pub. L. No. 73-474, 48 Stat. 1236 (1934) ............................. 22

**Constitutional Provisions**

U.S. Const. amend. II ......................................... 15, 16, 18, 20

U.S. Const. amend. IV .............................................................. 6

**Argument**

**1.    The district court clearly erred in concluding that Mr. Shobert voluntarily consented to the search of his home.**

At bottom, the government believes that Mr. Shobert's initial reluctance to allow officers to search his house for guns without him present abated because Sergeant Oberth casually convinced him to help law enforcement with its staffing issues. Further, it contends that law enforcement correctly told him relinquishment was a furlough condition even though the motion requesting the furlough and the order granting that motion did *not* contain a condition that he relinquish firearms. According to the government (at 21-25), there was an unwritten precondition that he allow law enforcement into his home to retrieve his firearms before the county attorney would request the furlough.

The government's arguments are unpersuasive. Entry into Mr. Shobert's home and seizure of his firearms was not required for the furlough, contrary to what Mr. Shobert was told, and officers successfully convinced him to allow law enforcement to search his home by making him believe his continued treatment was related to, or would affected by, securing a medical furlough.

There is no other plausible way to interpret Sergeant Oberth's statements to Mr. Shobert—the sergeant, at minimum, falsely implied to Mr. Shobert (and convinced him) that it would be better for his treatment if he consented to the search.

## A. The record does not show that the county attorney unilaterally imposed an unwritten condition that Mr. Shobert comply with bond conditions during his entire stay in the hospital.

Mr. Shobert argues (at 13-15) that the district court committed clear error by failing to consider that Sergeant Oberth falsely told him that a condition of the furlough was that he relinquish his firearms and that this, in conjunction with his medical state, induced him to consent.

In response, the government contends (at 21-25) that Mr. Shobert was *correctly* told relinquishment was a condition of the furlough. The government does not contend that law enforcement asked the court to impose a relinquishment condition or that the court did impose that condition in its furlough order. Instead, the government pursues a new theory for the first time on appeal, arguing there was a backchannel unwritten agreement between the sergeant and the county attorney that the county attorney would only request a furlough if Mr. Shobert agreed to let law enforcement into his home to confiscate his firearms.

In the government's view, law enforcement thus did not misinform Mr. Shobert that relinquishment was required, and he voluntarily consented to the search to help law enforcement with its staffing issues. Additionally, the government argues (at 24-25) that his medical condition and placement in the emergency room had no appreciable effect on his ability to provide consent to the search.

The government's arguments fail for four reasons.

**First**, the record does not show—and the government does not explicitly argue—that the county attorney in fact sought the medical furlough based on the seizure of Mr. Shobert's firearms or his consent to the search. The government's argument that Mr. Shobert was correctly informed he had to relinquish firearms before the county attorney would ask for the furlough cannot get off the ground unless that happened. The record does not indicate that it did.

The furlough order contained no relinquishment requirement (or requirement he comply with bond conditions) because the county attorney did *not* request it. Vol. II, 35-37. Thus, the government essentially contends that the county attorney made a highly counter-intuitive backchannel request for compliance with bond conditions

(including relinquishment) up front with no ability to enforce that agreement while Mr. Shobert was on the furlough.[1]

The county attorney did not testify, and the government never presented evidence showing that he only requested the furlough after law enforcement seized Mr. Shobert's firearms. Here, the government relies on cherry-picked snippets of Sergeant Oberth's testimony, Vol. IV, 59, 61, 66-67, to support its argument. But the sergeant's testimony, read in its entirety, provides no support for the government's interpretation of the record.

Sergeant Oberth testified that the relinquishment condition required that law enforcement retain possession of Mr. Shobert's firearms through the "pendency of his case" because it was *a condition of bond* he had to follow by court order—*i.e.,* Mr. Shobert had to continue to comply to *remain* on the furlough, not just to have one requested. Vol. IV, 59, 68.

_____

[1] Compliance with bond conditions was impossible during the furlough, as Sergeant Oberth testified. Vol. IV, 62. Mr. Shobert could not, for example, comply with the condition that he report to the sheriff's office daily while he was hospitalized. *Id.*

**Second**, and relatedly, the record unsurprisingly undermines the government's argument that there was an unwritten precondition for requesting the furlough because the government explicitly disavowed, at the suppression hearing below, the very argument it makes here for the first time. At the hearing, it made a pointed attempt to prove that law enforcement—including the county attorney[2]—did *not* unilaterally impose the relinquishment condition for the furlough, and it argued that Mr. Shobert was *not* told relinquishment was a furlough condition.

For example, when the government asked Deputy McClain who imposed the furlough condition that Mr. Shobert must relinquish his firearms, she initially responded that the county attorney imposed it. Vol. IV, 33. *On the government's immediate prompting,* she then corrected herself, explaining that the *court* imposed this condition and that the county attorney had asked the county court to approve the condition. *Id.* Then, at the hearing's conclusion, the government argued against suppression based on its contention that Sergeant Oberth did *not* tell Mr. Shobert that the furlough required relinquishment but

---

[2] The government admits (at 22) that the county attorney was acting in a law enforcement capacity, under state law, by requesting the furlough.

instead told him that he would have to relinquish his firearms if he later wanted to be released on bond after the furlough. Vol. IV, 116.

**Third**, from its flawed argument that there was an unwritten precondition of relinquishment, the government attempts (at 23) to recast Mr. Shobert's "choice" as simply between helping law enforcement and not helping, which misses the mark.

Instead, law enforcement presented Mr. Shobert with this false choice: either consent to the search to avoid burdening law enforcement and disrupting his medical treatment *or* assert his Fourth Amendment rights at the cost of both. In reality, asserting his constitutional rights would have imposed no burden on law enforcement and would not have affected his treatment. The furlough was requested and granted without the relinquishment condition, and the furlough was unnecessary to ensure Mr. Shobert's continued treatment in the hospital.

Mr. Shobert's "choice" to "help" law enforcement, therefore, was not voluntary because this was a false "choice," which had no effect on law enforcement's use of its resources. Law enforcement conveyed to Mr. Shobert that he could help avoid hardships on the sheriff's office

and himself by consenting to the search, which would avoid it having to sacrifice a full-time position to sit with him—something Sergeant Oberth desperately wanted to avoid. Moreover, this false choice was all the more coercive because Sergeant Oberth refused to wait until after Mr. Shobert's medication wore off and he was transferred out of the emergency room. The sergeant's apparent hurry only further suggested to Mr. Shobert that the harm to be avoided was imminent.

**Fourth**, contrary to the government's argument (at 24-25), Mr. Shobert's condition is a significant factor here. According to the government (at 24), the deputies testified that he had "substantially recovered from his seizure" and that his treating physician stated that Mr. Shobert could have become "fully oriented" when Sergeant Oberth sought consent.

The testimony the government cites supports no such interpretation,[3] and it does not undercut Dr. Lauer's testimony that the sergeant requested consent when the effects of the sedative were only

---

[3] The sheriff's deputies did not testify he had "substantially recovered"; rather, they opined he was more coherent and responsive than he was upon admission to the emergency room. Vol. IV, 29. And Dr. Lauer's cited testimony does not reference any particular time at which Mr. Shobert could become "oriented."

"gradually" wearing off and when Mr. Shobert could not make "any important decisions." Vol. IV, 87, 90. As the doctor explained, a patient may appear alert and awake yet not have recovered from the seizure's effects. *Id.*, 83. Thus, while Mr. Shobert might have been able to converse with the deputies, he could not have understood what the sergeant never explained to him: that the sheriff's office would get the furlough regardless and that his stay in the hospital and treatment would be unaffected without the furlough.

* * *

In short, the government identifies nothing in the record to show that Mr. Shobert's furlough required relinquishment, despite law enforcement telling him otherwise. Among the relevant factors courts must consider in the voluntariness analysis are whether officers relied on promises, inducements, deception, or trickery to elicit consent. *See United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). The fact that law enforcement falsely told Mr. Shobert his furlough required relinquishment clearly bears on whether his assent to law enforcement's request to search his home was involuntary because of improper inducement. Therefore, the district court committed clear

error by failing to address this critical fact. *See Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1271 (10th Cir. 2002).

## B. The testimony shows that Sergeant Oberth implied to Mr. Shobert that his treatment would be affected if he did not get a medical furlough.

The government contends (at 18-21) that law enforcement's expressed concern for Mr. Shobert's continued treatment was not tied to his consent to search. Although it acknowledges Sergeant Oberth referred to Mr. Shobert's *need for medical treatment* when explaining why he wanted *the furlough* and why he wanted Mr. Shobert's *consent to enter the home*, the government insists (at 21) that the witnesses' testimony "pulled those concepts apart, explaining the sequence of events and conversation in context."

Nothing in the record contradicts Deputy McClain's account for that conversation, which she witnessed. Her unrebutted testimony shows that "those concepts" (Mr. Shobert's continued treatment, the furlough, and agreeing to the search) were intertwined and that the sergeant *did* suggest that the furlough—or lack thereof—would affect Mr. Shobert's treatment. Vol. IV, 32-33. When the government asked Deputy McClain to describe what Sergeant Oberth said, she explained,

> Deputy Oberth came in and basically said, you
> know, *Per your court conditions and per the county
> attorney*, if you'll allow us to go in and get your
> firearms from your house and keep them as
> safekeeping at the law enforcement center until
> your trial is over with, *then we can do a medical
> furlough so that you can get the treatment you need*.

*Id.* (emphases added). And when she explained why Mr. Shobert agreed,

she noted that he believed his medical care was tied to consent: "He told

us that we could go to his house and get them. *He needed medical care*."

*Id.*, 35 (emphasis added).

The government ignores this testimony and does not assert that

Deputy McClain was mistaken about what she heard. Further, the

government never explains exactly what that other, alleged sequence or

missing context was to support its argument that law enforcement did

not even suggest to Mr. Shobert that his medical care could depend on

getting the furlough.

Instead, it relies on Deputy McClain and Sergeant Oberth's

bottom-line denials that the sergeant explicitly threatened to withhold

treatment. These self-serving characterizations of the sergeant's

statements do not change his and Deputy McClain's testimony about

what he said to Mr. Shobert (testimony the court did not specifically

address) and do not contradict that the sergeant's statements *implied* that not getting the furlough would have some effect on Mr. Shobert's treatment.

The government also focuses (at 21) on Sergeant Oberth's statement in which he testified that he mentioned medical care in response to Mr. Shobert's request to accompany the officers during the search. The Sergeant testified that he responded to Mr. Shobert by stating, "my *only* concern was that he get medical treatment that he needs." Vol. VI, 67 (emphasis added).

According to the government, this testimony shows that the sergeant merely explained that Mr. Shobert could not accompany the officers because leaving the hospital to accompany the officers would necessarily "interrupt[] his treatment." This is wrong. Nothing in the sergeant's gloss on what he generally conveyed to Mr. Shobert shows he merely told Mr. Shobert that leaving the hospital would necessarily interrupt treatment. More important, Sergeant Oberth's testimony here does not contradict Deputy McClain's account of what he told Mr. Shobert—that the furlough would ensure continued care—but instead reaffirms her account.

What the sergeant expressed to Mr. Shobert was that he was not looking to investigate Mr. Shobert for all the weapons around the house and any other things he wanted to take care of (he was "not concerned" about these items); rather, he was only concerned that Mr. Shobert receive needed treatment because he did not have "the personnel to sit on him [Mr. Shobert] in the hospital." Vol. VI, 67. Simply put, Sergeant Oberth conveyed to Mr. Shobert that his consent to search would have something to do with his treatment going forward. It would otherwise make no sense for the sergeant to tell Mr. Shobert that treatment was his "only concern," not criminal investigation.

All told, while Sergeant Oberth might not have explicitly said that treatment would be withheld if Mr. Shobert denied consent, he stopped just short of that and implied that would be the result. The sergeant never told Mr. Shobert that he would get treatment regardless of the furlough and even if the sheriff's office could not have someone "sit on him the entire time."

Accordingly, the district court's conclusion that there were no "indications that he [Mr. Shobert] . . . would not continue to receive that treatment if he did not consent to them [law enforcement] removing the

firearms]" is implausible and lacks record support. *Id.*, 138. Witness testimony about what Sergeant Oberth told Mr. Shobert clearly showed that the sergeant's statement *did* imply his treatment could be affected. Further, the witnesses never testified to the contrary—they did not testify that the sergeant avoided any implication that treatment could be affected.

The court declined to address Deputy McClain's unrebutted testimony about what Sergent Oberth said, and it made no findings about what he specifically said to Mr. Shobert. Instead, it appears to have simply credited the witnesses' statements that the sergeant did not threaten to withhold treatment or explicitly tell Mr. Shobert his treatment depended on his cooperation.

Thus, the district court's finding that the sergeant did not even suggest or imply treatment would be affected has no support in the record and is belied by the testimony it did not address. It was clear error for the court to conclude that the government met its burden. *See, e.g., United States v. Nichols*, 229 F.3d 975, 980-81 (10th Cir. 2000).

This Court should reverse.

**2.    18 U.S.C. § 922(o) is unconstitutional.**

As the government notes, § 922(o)'s constitutionality is at issue in *United States v. Morgan*, No. 24-3141 (10th Cir.), which has been fully briefed and was argued before this Court on July 8, 2025. As the issue will likely be resolved in that case first, Mr. Shobert briefly responds to the government's arguments.

The government offers three arguments supporting its position that § 922(o) is constitutional: (A) the statute is a permissible "restriction on the mode or manner of fire" of firearms (at 27-29); (B) machine guns "are not in common use for lawful purposes" (at 32-38); and (C) § 922(o) is a permissible ban on "dangerous and usual weapons" (38-47). The government cannot meet its burden to show that § 922(o) does not unconstitutionally infringe on Mr. Shobert's Second Amendment rights.

## A. Section 922(o) does not simply restrict the "mode or manner" of firearms use.

The government argues (at 27-29) that § 922(o) is a "permissible restriction on the mode or manner of fire" and not a restriction on the possession of "a particular class of weapons." Beyond suggesting that § 922(o) is just like a ban on concealed carrying of firearms in public—

14

which the government assumes is constitutional—it does not convincingly explain why a prohibition on the "mode or manner" of fire is categorically beyond the Second Amendment's scope. It appears to suggest (at 28) that a restriction on the "mode or manner" of fire does not "broadly negate" the right to bear arms and so is constitutional as a "reasonable" restriction.

The government cannot support its argument that the federal definition of "machinegun," 26 U.S.C. § 5845(b), defines a manner of fire and not a type of weapon. It offers little more than its *ipse dixit*, declaring (at 28) that § 922(o) "does not even ban a particular class of weapons—such as rifles, pistols, or shotguns—but instead requires that all weapons of all classes be configured for semiautomatic rather than fully automatic fire."

Yet, by its plain language, § 5845(b) *does* define a type of class of weapon—a "*machinegun*"—based on a distinct characteristic (that it is capable of fully automatic firing), and therefore § 922(o) bans possession of a type of weapon—a "*machinegun*."

Certainly, the government's argument (at 28) that § 922(o) "requires that all weapons of all classes be configured for semiautomatic

rather than fully automatic fire" is incorrect. The statute says nothing about how firearms must be configured. So, it does not *require* that "*all weapons of all* classes"—which would include non-semiautomatic firearms like revolvers, bolt-action and muzzle loading rifles, and single shot shotguns (and, facially, all non-firearms that are weapons)—be "configured for semiautomatic fire." Federal law does not mandate that all firearms be semiautomatic.

## B. The Government's argument that machine guns are not in "common use for lawful purposes" fails.

Citing the *Heller* decision, the government contends (at 29-32) that machine gun possession does not fall within the Second Amendment's protections because they are not in common use for lawful purposes. To the extent the government contends that weapons not "in common use" are categorically exempt from Second Amendment protections, it is mistaken. The Second Amendment presumptively protects the possession of "all instruments that constitute bearable arms," even those that did not exist at the nation's founding. *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The government makes no persuasive case that machine guns are not *bearable arms*.

*Heller* does not support the government's argument here. To start, the Court did not apply the analysis it later established in *Bruen*, and it did not address the constitutionally of § 922(o). Also, the Court did not hold or imply that machine gun bans are constitutional or that machine guns are "not 'typically possessed by law-abiding citizens for lawful purposes . . . .'" Answer Brief at 32. Nor did the Court define the scope of the right to bear arms except to hold that a federal handgun ban is unconstitutional under the Second Amendment. Notably, machine gun bans were not among the "longstanding prohibitions" the opinion did not "cast doubt on." *See Heller*, 554 U.S. at 626-27.

Next, the government argues (at 35-36) that the district court's "focus" on the 740,000 lawfully possessed machine guns was improper, and it cites information from another case, which it did not present in the district court, to suggest this number is inaccurate.[4] This Court should decline to consider this belated argument and evidence it failed to present to the district court. *See, e.g., New York State Rifle & Pistol*

_____

[4] Instead, without citing specific evidence, it argued below that the number of arms owned by civilians "is *likely* far less than . . . firearms residing with state law enforcement." Vol. I, 56 (emphasis added).

*Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022). Regardless, the government does nothing to undermine Mr. Shobert's showing (at 26-27) that machine guns are in "common" enough use to be presumptively protected by the Second Amendment.

Finally, the government presents additional statistics (at 37) about the cost and difficulty of obtaining a machine gun—which it also did not present below where it bore the burden to show § 922(o) is constitutional—to support its argument machine gun ownership is too rare to receive constitutional protection.

Even if this Court were to consider this argument in the first instance, it should fail on the merits because a ban's existence and efficacy cannot make it constitutional. Lawful machine gun ownership and possession is considerably lower compared to that of other firearms *because* § 922(o) now generally makes possession of a machine gun illegal. By its logic, the government could pass a law banning any type of firearm and that ban would be upheld so long as the government successfully enforced it.

**C. The government does not show there is a historical tradition that is relevantly similar to a ban on the possession of machine guns.**

According to the government (at 38-47), § 922(o)'s effective ban on machine guns is relevantly similar to a regulatory tradition allowing the government to ban "the carrying of dangerous and unusual weapons." As it does elsewhere, the government attempts (at 41-44) to build a historical record for the first time on appeal, presenting this Court, in a series of footnotes, with a host of historical state legislation. Again, while this Court should not consider this new collection of historical materials, *Bruen*, 597 U.S. at 60, the government's arguments nonetheless fail to meet its burden to show that § 922(o) is constitutional. *See Rahimi*, 602 U.S. at 691 (The government "bears the burden 'to justify its regulation.'") (quoting *Bruen*, 597 U.S. at 24).

> (i) *"Going armed" laws are not relevantly similar to a ban on machine gun possession in the home.*

The government contends (at 39-41) that historical "going armed" laws, which, as it explains, regulated or restricted the *carrying* of certain weapons in public to protect the public peace, demonstrate that § 922(o) is a constitutional restriction. These laws, as explained by the government, do not support its argument. It fails to show how these

historical laws are relevantly similar in both *why and how* they burden Second Amendment rights. *See Rahimi*, 602 U.S. at 698.

At best, the government's new sources show a regulatory tradition restricting the *public carrying* of certain weapons to preserve the peace. Yet, § 922(o) is not a restriction on a particular means of bearing arms—it is a categorical prohibition on the possession of certain arms, which applies even inside one's home. As Mr. Shobert argues (at 27-28), the government can show no similar historical tradition of banning the possession of machine guns in one's home and in a way the public peace is not threatened or people terrorized. The government provides no cogent response to this argument by explaining how § 922(o) is relevantly similar to going armed laws "in both *why and how* it burdens the Second Amendment right." *See id.*

(ii) *State bans on "blunt weapons" are not relevantly similar to a ban on machine gun possession.*

The government also contends that "[m]any states" banned the possession of certain "blunt weapons" (like slingshots and brass knuckles), but it cites only *seven* pieces of legislation from the mid-to-late 1800s in a footnote. The government does not bother to explain each restriction, what particular problems they addressed, how those

restrictions are relevantly similar to a machine gun ban, or how they—as a fraction of jurisdictions—show any historical tradition.

This lack of explanation is especially problematic here because the government provides no persuasive argument showing why prohibitions on "blunt weapons" shows a relevantly similar analogue *specific to machine gun bans* that does not similarly apply to a prohibition on possession of other types of firearms, like handguns, that the Second Amendment protects. *See id.*

> (iii) *A historical tradition of machine gun regulation does not make a categorical ban on machine gun possession constitutional.*

As the government recognizes, the machine gun ban here was enacted in 1986, which was over half a century after machine guns became available. Yet, the government relies (at 43-44) on a body of state and federal statutes that brought machine guns under governmental regulation in the 1920s. Beyond characterizing these cited statutes as "anti-machinegun laws," which it says includes "comprehensive bans," the government does nothing to explain these laws.

The government's perfunctory gloss on its cited materials is unpersuasive because, elsewhere, it argues (at 34) that twelve states and the District of Columbia *currently* outright ban machine gun possession "by private persons, regardless of whether they are properly registered under the National Firearms Act." This appears to be incorrect as to California, Colorado, and New Jersey, whose statutes facially permit private persons with valid permits to possess machine guns. *See* Cal. Penal Code §§ 32625(a), 32650, 32655; Colo. Rev. Stat. § 18-12-102(5); N.J. Stat. Ann. §§ 2C:39-5, 2C:58-5.

Further, the government, when discussing the National Firearms Act of 1934, characterizes as "anti-machinegun" any law that *regulates* the possession, sale, or use of a machine gun. But regulation, to which *all* firearms are subject under that act, differs from prohibition. The *Bruen* test acknowledges the existence of a historical tradition of firearms regulation generally. *See Bruen*, 597 U.S. at 24. Thus, historical regulation of a firearm alone cannot support a ban on its possession. *See, e.g., Heller*, 554 U.S. at 628-32.

\* \* \*

What the government must show is a "relevantly similar," "well-established and representative historical *analogue*" to § 922(o). *See Bruen*, 597 U.S. at 29-30. It does not make this showing—it shows no analogous historical regulation of firearms based on their rates of fire (or any other "relevantly similar" characteristic).[5] Instead, the government shows only that firearms have historically been subject to various forms of regulation. That is far from enough.

---

[5] The government does not directly address Mr. Shobert's as-applied challenge in which he argues (at 27-28) that his possession of the weapons solely in his home and that he never threatened the public peace with the weapons renders § 922(o) unconstitutional as-applied to him. Contrary to what the government suggests (at 47), he did argue this point below. Vol. I, 25.

## Conclusion

The district court erred by concluding that Mr. Shobert provided voluntary consent for officers to search his house and that § 922(o) is constitutional facially and as-applied. This Court should therefore reverse.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


By: */s/ Jon W. Grevillius*
      Jon W. Grevillius
      Assistant Federal Public Defender
      633 17th Street, Suite 1000
      Denver, Colorado 80202
      (303) 294-7002
      Email: Jon_Grevillius@fd.org

# Certificate of Compliance

As required by Fed. R. App. P. 32(g)(1), I certify that this brief is proportionally spaced and contains 4,434 words. I relied on my word processor to obtain the count, and the information is true and correct to the best of my knowledge.

*/s/ Jon W. Grevillius*
Jon W. Grevillius
Assistant Federal Public Defender